EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Departamento de la Familia<br><br>Peticionaria<br><br>v.<br><br>Ana Cacho González<br><br>Recurrido | Certiorari<br><br>2013 TSPR 69<br><br>188 DPR ____ |

Número del Caso: CC-2012-1116
                 cons con.
                 CC-2012-1125

Fecha: 18 de junio de 2013

Tribunal de Apelaciones:
Región Judicial de: Bayamón

**CC-2012-1116**
Oficina del Procurador General:

            Lcdo. Luis Román Negrón
            Procurador General

            Lcda. Lisa Durán Ortiz
            Procuradora General Interina

            Lcda. Celia Molano Flores
            Procuradora General Auxiliar

Abogados de la Parte Recurrida:

            Lcda. Sharon E. González Maldonado
            Lcdo. Luis Torres Asencio
            Lcda. Carmen Vargas Medina

Departamento de la Familia:

            Lcda. Olga López Báez

**CC-2012-1125**
Departamento de la Familia:

            Lcda. Olga López Báez

Abogado de la Parte Recurrida:

            Lcdo. Luis José Torres Asencio

Materia: Sentencia con Opiniones de Conformidad

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Departamento de la Familia

    Peticionaria

        v.                CC-2012-1116
                          Cons con.
Ana Cacho González        CC-2012-1125

    Recurrida


SENTENCIA

San Juan, Puerto Rico, a 18 de junio de 2013.

En esta ocasión nos vemos obligados a intervenir con la trama judicial surgida a raíz del asesinato del menor L.G.C. el 9 de marzo de 2010 en el hogar de su madre, la Sra. Ana Cacho González. Recurren ante nos el Departamento de la Familia (en adelante, "Departamento") y el Procurador General de una Sentencia del Tribunal de Apelaciones que revoca una Resolución del Tribunal de Primera Instancia y concede visitas supervisadas a la señora Cacho González con relación a sus dos hijas menores de edad. Debemos resolver: (1) si el Tribunal de Primera Instancia resolvió adecuadamente las controversias sobre el descubrimiento de prueba; (2) si es admisible el testimonio de la perito del

Departamento, la Dra. Elsa Cardalda; (3) si procede concederle a la señora Cacho González relaciones materno-filiales sin la celebración de una vista para dilucidar este particular; y (4) si procede relevar al Departamento de continuar realizando esfuerzos razonables de reunificación familiar.

Examinadas las comparecencias de las partes así como el expediente del caso: (1) se ordena que el Tribunal de Primera Instancia resuelva, de manera específica, el alcance del descubrimiento de prueba; (2) se revoca el decreto de inadmisibilidad del testimonio de la doctora Cardalda; (3) se deja sin efecto la orden concediendo visitas supervisadas a la señora Cacho González; (4) se confirma la orden de celebración de una vista para auscultar la posibilidad de conceder relaciones materno-filiales a la señora Cacho González; (5) se confirma el dictamen con relación a la celebración de una nueva vista de esfuerzos razonables y, mientras tanto, se mantiene la custodia provisional de las menores a favor de su padre, Sr. Ahmed Alí González; (6) se modifica la orden de ampliación de los informes a los únicos efectos de aclarar que estos deberán ser suplementados y actualizados de acuerdo a las intervenciones realizadas hasta el momento por los diferentes profesionales que han estado atendiendo a las menores durante el proceso; y (7) se devuelve al Tribunal de Primera Instancia para la continuación de los procedimientos.

Dicho foro deberá atender con carácter expedito los asuntos pendientes ante su consideración, en especial lo

relativo a la concesión de relaciones materno-filiales, con la rapidez y sensibilidad que requieren los casos como el de autos.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Presidente señor Hernández Denton emitió Opinión de Conformidad a la cual se unen los Jueces Asociados señores Martínez Torres y Estrella Martínez. La Juez Asociada señora Rodríguez Rodríguez emitió Opinión de Conformidad a la cual se unen la Juez Asociada señora Pabón Charneco y los Jueces Asociados señores Kolthoff Caraballo y Rivera García. El Juez Asociado señor Feliberti Cintrón no interviene.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Departamento de la Familia

    Peticionaria

          v.

  Ana Cacho González

    Recurrida

CC-2012-1116
cons. con    *Certiorari*
CC-2012-1125

Opinión de Conformidad emitida por el Juez Presidente SEÑOR HERNÁNDEZ DENTON a la cual se unen los Jueces Asociados SEÑOR MARTÍNEZ TORRES y SEÑOR ESTRELLA MARTÍNEZ.


En San Juan, Puerto Rico, a 18 de junio de 2013.

Por los fundamentos que exponemos a continuación, estamos conformes con la Sentencia emitida en el presente caso. No obstante, nos vemos obligados a suscribir esta Opinión de Conformidad por entender que los procedimientos al amparo de la antigua Ley Núm. 177-2003 (8 L.P.R.A. secs. 444-450m), (Ley Núm. 177), hoy Ley para la Seguridad, Bienestar y Protección de Menores, Ley Núm. 246-2011 (8 L.P.R.A. secs. 1101-1206), (Ley Núm. 246), están delimitados por los derechos fundamentales y las protecciones constitucionales de las relaciones entre padres e hijos. Por ello, consideramos que el estándar probatorio al que debe estar sujeto el Estado en este

tipo de procedimientos debe ser el de prueba clara, robusta y convincente.

I.

La Sra. Ana Cacho González y el Sr. Ahmed Alí González son los padres de los menores A.G.C., L.G.C. y A.C.G.C. El 9 de marzo de 2010, estando bajo la custodia de la señora Cacho González, el menor L.G.C. fue asesinado en su casa en Dorado. Al día de hoy no se han presentado cargos criminales por los hechos y la muerte del menor no ha sido esclarecida. A raíz de esos hechos, el Departamento de la Familia (en adelante "Departamento") activó un Plan de Seguridad a tenor con la Ley Núm. 177, *supra*, mediante el cual reubicó a las menores A.G.C. y A.C.G.C. en el hogar de su tía-abuela materna como medida protectora; ambos padres aceptaron dicho plan. Las menores continuaron relacionándose con sus padres bajo la supervisión de la agencia. A su vez, el Departamento comenzó a brindar servicios y evaluar a las menores y a los padres.

El 30 de marzo de 2010, tras la evaluación de las menores y la recomendación de la psicóloga, Dra. Elsa Cardalda, y la trabajadora social, Sra. Vanessa Santana Concepción, ambas del Departamento, esta agencia presentó ante el Tribunal de Primera Instancia una Petición de Emergencia al amparo de la Ley Núm. 177, *supra.* Solicitó que se le transfiriera la custodia de las menores por entender que el bienestar emocional y la seguridad física de las menores se encontraban en peligro inminente pues la señora Cacho González no había podido aclarar lo ocurrido la noche de la muerte de L.G.C. El Departamento también alegó que

la abuela materna y la señora Cacho González habían manipulado e instruido a las menores para que ocultaran lo ocurrido la noche de la muerte de L.G.C. y que esto, a su vez, les estaba causando más daño emocional y psicológico. Finalmente, adujo que las menores tenían conocimiento sobre los hechos ocurridos la noche del asesinato, pero que estas ofrecieron información limitada a las trabajadoras sociales que intervinieron en el caso.

Ese mismo día, el foro primario celebró la vista de Petición de Emergencia. En esta, la doctora Cardalda y la trabajadora social Santana Concepción testificaron sobre los hallazgos de sus intervenciones. El 30 de marzo de 2010, el Tribunal de Primera Instancia concedió la solicitud de remoción, suspendió provisionalmente las visitas de ambos padres y emitió una orden de mordaza a todas las partes. Desde ese día, la señora Cacho González no ha visto a sus hijas, quienes inicialmente fueron ubicadas por el Departamento en dos hogares de crianza separados y actualmente residen con su padre.

Al mes siguiente se celebró la vista de ratificación de remoción en la cual estuvieron presentes: (1) el Departamento, acompañado por la trabajadora social Santana Concepción; (2) la Procuradora Especial para los casos de maltrato de menores (en adelante, "la Procuradora Especial"); (3) la señora Cacho González; y (4) el señor Alí González, quien alegó ser parte con interés en el proceso y solicitó la concesión de relaciones paterno-filiales. Tras la admisión del Informe de Intervención preparado por la trabajadora social Santana Concepción, la

señora Cacho González aceptó que el proceso de remoción fue conforme a derecho y manifestó estar de acuerdo con que las menores se reubicaran provisionalmente en alguno de los hogares recomendados en el Informe de Intervención. No obstante, impugnó la determinación de negligencia que surgía del mismo. Por su parte, la Procuradora Especial alegó que la señora Cacho González se había comunicado con la hija mayor mediante correo electrónico, por lo que el tribunal le advirtió que no podía comunicarse, directa ni indirectamente, con ninguna de las menores.

Luego de la vista de ratificación, el foro primario emitió una sentencia en la que determinó que la remoción de las menores se llevó a cabo conforme a derecho y ordenó: (1) al Departamento a ofrecer un Plan de Servicios a la señora Cacho González, advirtiendo que el incumplimiento con dicho plan conllevaría la privación de la custodia y patria potestad y el cese de esfuerzos razonables de reunificación por parte del Departamento; (2) la entrega provisional de la custodia legal de las menores al Departamento; (3) la permanencia de las menores en los respectivos hogares de crianza seleccionados por el Departamento; (4) visitas paterno-filiales supervisadas; y (5) la continuación de la orden de mordaza. Se pautó una vista de seguimiento para una fecha posterior.

Luego de esto, el trámite del caso se caracterizó por la presentación de numerosas mociones argumentativas e incluso, procedimientos en alzada, centrados en cuatro controversias medulares, a saber: el alcance del descubrimiento de prueba y la admisibilidad de la prueba pericial, la concesión de

relaciones materno-filiales, el cese de esfuerzos razonables de reunificación familiar por parte del Departamento y la custodia permanente de las menores.

El Departamento, en cumplimiento con lo ordenado por el foro primario, preparó un Plan de Servicios para la señora Cacho González que incluía una evaluación sobre sus capacidades protectoras, orientación sobre el maltrato de menores y el abuso de sustancias controladas, entre otros aspectos. Además, la señora Cacho González fue sometida a pruebas toxicológicas que arrojaron resultados negativos al uso de varias sustancias controladas. Tras la desaparición de las primeras evaluaciones psicológicas realizadas a la señora Cacho González, esta fue referida a la psicóloga, Dra. Ivonne Sanabria Burgos, quien determinó que la señora Cacho González cuenta con las capacidades protectoras adecuadas para proteger a las menores. Por eso, recomendó el establecimiento de relaciones materno-filiales y que la señora Cacho González continuara en tratamiento psiquiátrico.

Por otro lado, las menores comenzaron a ser tratadas por la doctora Cardalda y por el Dr. Serafín Orengo Vega, psiquiatra del Programa Biosicosocial de la Escuela de Medicina de la Universidad de Puerto Rico. Este último las encontró estables dentro de sus circunstancias particulares. Finalmente, el padre de las menores aceptó voluntariamente someterse al Plan de Servicios del Departamento y este también obtuvo una evaluación psicológica favorable.

Durante el transcurso del procedimiento judicial, la señora Cacho González solicitó infructuosamente relaciones

materno-filiales en numerosas ocasiones. El Tribunal de Apelaciones confirmó una de estas denegatorias. Entre tanto, a pesar de mediar una orden de prohibición del tribunal, se alegó que la señora Cacho González se continuó comunicando con la mayor de las niñas. Por tal razón, esta última fue reubicada en otro hogar de crianza.

Una vez la señora Cacho González completó el Plan de Servicios, la nueva trabajadora social asignada al caso, la Sra. Iralis De Jesús Juarbe, recomendó que se relevara al Departamento de continuar con los esfuerzos de reunificación. Esto, tras concluir que estaban presentes varios de los criterios del Modelo de Seguridad utilizado por el Departamento para determinar si un menor está en peligro. En vista de ello, el Departamento presentó una moción a esos efectos que fue apoyada por la Procuradora Especial. El Departamento argumentó que procedía su solicitud dado que se configuraban las condiciones contempladas en los sub incisos (f) y (g) del inciso (3) del Art. 50 de la Ley Núm. 177, *supra*. Anunciada la doctora Cardalda como perito del Departamento, la señora Cacho González se opuso e impugnó infructuosamente la admisibilidad de su testimonio por alegadamente haber incurrido en un rol dual impermisible al actuar como psicóloga de evaluación y psicóloga de tratamiento de las menores.

Durante las vistas sobre cese de esfuerzos de reunificación familiar, testificaron por parte del Departamento la trabajadora social De Jesús Juarbe y la doctora Cardalda. Esta última concluyó que la señora Cacho González y la abuela materna manipularon a las menores, por lo que reunificarlas

significaría exponerlas a más abuso psicológico. Consiguientemente, recomendó que la custodia de las menores se concediera al padre y que se prohibieran las relaciones materno-filiales. De igual forma, la trabajadora social De Jesús Juarbe testificó que, aunque la señora Cacho González cumplió con el Plan de Servicios, esta "no lo internalizó" pues interponía sus intereses personales al de las menores. Ambas coincidieron en que debía decretarse el cese de esfuerzos razonables de reunificación. La señora Cacho González, por su parte, presentó el testimonio de la Dra. Nydia Lucca Irizarry, psicóloga clínica y forense, quien testificó que el enfoque utilizado por la doctora Cardalda era desacertado. Para llegar a esta conclusión, la doctora Lucca Irizarry tuvo acceso únicamente a los informes rendidos al Tribunal y al *currículum vítae* de las testigos.

El 8 de marzo de 2011, el foro primario emitió una resolución declarando con lugar la solicitud del Departamento sobre cese de esfuerzos razonables. Para ello, aplicó retroactivamente una enmienda introducida a la Ley Núm. 177, *supra*, luego de ocurrida las vistas sobre el cese de esfuerzos de reunificación familiar. La misma proveía para que el tribunal decretara el cese de los esfuerzos si a la luz de la totalidad de las circunstancias determinaba que la reunificación familiar no era en el mejor bienestar del menor. Además, privó permanentemente a la señora Cacho González de la custodia legal de sus hijas y prohibió toda relación materno-filial y las relaciones con toda la familia materna. Concluyó, entre otras cosas, que: (1) el hecho de que la señora Cacho

González es una posible sospechosa del asesinato del menor L.G.C. incide directamente sobre la seguridad de las menores; (2) la señora Cacho González no ha podido explicar la forma en que ocurrió la muerte del menor L.G.C.; (3) la señora Cacho González ha causado daño directo constitutivo de maltrato al manipular a las menores para que no divulguen lo ocurrido la noche del asesinato; y (4) la señora Cacho González no puede garantizar la seguridad física ni emocional de las menores, por lo que no tiene capacidades protectoras.

Tras una infructuosa Moción de Reconsideración, la señora Cacho González acudió al Tribunal de Apelaciones. Ese foro revocó el referido dictamen y devolvió el caso para la celebración de una nueva vista de cese de esfuerzos razonables. En particular, descartó el testimonio de la doctora Cardalda por entender que esta incurrió en un impermisible rol dual como psicóloga de evaluación y de tratamiento. Por consiguiente, ordenó que luego de que se nombrara un evaluador psicológico, se ampliaran los informes y se estableciera un nuevo Plan de Servicios. También, sustituyó la custodia permanente concedida al padre mediante Resolución el 8 de noviembre de 2011 por custodia provisional. Por último, autorizó relaciones materno-filiales supervisadas. Basó su determinación en que a la señora Cacho González se le violó el debido proceso de ley al aplicarse retroactivamente la enmienda introducida a la Ley Núm. 177, *supra*, en diciembre de 2010; se violó el privilegio psicoterapeuta-paciente de acuerdo a Ortiz v. Meléndez, 164 D.P.R. 16 (2005); la parte recurrida y su perito debieron tener acceso al expediente del Departamento; y no se ponderó de

manera adecuada la concesión de la custodia permanente al padre.

Insatisfechos con esta determinación, el Procurador General y el Departamento comparecieron ante nos mediante sendos recursos de *certiorari*. Consolidamos los recursos y ordenamos a la señora Cacho González que mostrara causa por la cual no se debía modificar el dictamen recurrido en cuanto a los siguientes extremos: (1) la celebración de una nueva vista de esfuerzos razonables de reunificación familiar; (2) la admisibilidad del testimonio de la doctora Cardalda; y (3) la concesión de visitas supervisadas a la señora Cacho González. Así lo hizo. Tanto el Departamento como el Procurador General presentaron réplicas al escrito presentado por la señora Cacho González y esta presentó una breve dúplica.

Con el beneficio de la comparecencia de todas las partes, expedimos ambos recursos.

II.

### A. Derechos y deberes de los padres

La patria potestad ha sido definida como el conjunto de derechos y deberes que corresponde a los padres sobre la persona y el patrimonio de cada uno de sus hijos no emancipados como medio de realizar la función natural que les incumbe de proteger y educar a la prole. Rodríguez v. E.L.A., 122 D.P.R. 832, 836 (1988).

La custodia, por su parte, es la convivencia o control físico que tiene un progenitor sobre sus hijos. La misma está íntimamente relacionada a la patria potestad al punto que se considera un componente de esta última. Ex parte Torres, 118

D.P.R. 469 (1987). Es decir, "los aspectos de custodia de menores no son en estricta lógica separables de la patria potestad, por ser aquella una de las varias consecuencias de ésta". E. González Tejera, Bienestar del menor: Señalamientos en torno a la patria potestad, custodia y adopción, 54 Rev. Jur. U.P.R. 409, 428 (1985). Por tal razón, y aunque la patria potestad es el concepto jurídico más abarcador de los tres, esta puede asignarse a uno solo de los padres sin que ello implique necesariamente la pérdida de la custodia o las relaciones materno/paterno-filiales del otro. Por ejemplo, el Art. 152 del Código Civil, 31 L.P.R.A. secc. 591, establece que, entre otras razones, la patria potestad puede ser ejercida por un solo padre cuando el otro padre haya sido privado de la misma. En fin, los tribunales "[pueden] asignar la patria potestad de los hijos menores a uno de los padres y la custodia al otro, o la patria potestad compartida, con la custodia a uno solo de los padres". González Tejera, supra, pág. 419.

Por último, las relaciones materno/paterno-filiales se refieren a aquel derecho que corresponde naturalmente al padre o a la madre para comunicarse y relacionarse con aquellos hijos que por resolución judicial han sido confiados a la custodia de otra persona. Sterzinger v. Ramírez, 116 D.P.R. 762, 775 (1985). Es un derecho de naturaleza personal y familiar de contenido afectivo. Íd. Mediante su concesión, se busca favorecer y facilitar las más amplias relaciones humanas entre familiares, teniendo en cuenta el bienestar del menor. Íd. Este derecho es de tal envergadura que, aunque los tribunales pueden regularlos, no pueden prohibir las relaciones totalmente, salvo

la existencia de causas muy graves. Íd., pág. 775; Gorbea v. Látimer, 34 D.P.R. 204 (1925). Además, el derecho a las relaciones paterno/materno-filiales debe entenderse lo más liberalmente posible. Centeno Alicea v. Ortiz, 105 D.P.R. 523, 527 (1977).

Como bien señalamos en Sterzinger v. Ramírez, *supra*:

[n]o debe ignorarse el hecho de que la incapacidad para ejercer la custodia no incapacita necesariamente para el ejercicio del derecho a visitar los hijos menores y que los mejores intereses de los niños requieren que se proteja el ejercicio de ese derecho. Después de todo, el no custodio puede advenir custodio, con el transcurso del tiempo y cambio en circunstancias. Por lo tanto, las relaciones paterno [materno] filiales adecuadamente cultivadas facilitarían esa transición entre custodios. Íd., pág. 774.

Vemos pues que las relaciones materno/paterno-filiales representan lo mínimo que se puede poseer dentro del conjunto de derechos que emanan de la paternidad y la maternidad. En ausencia de la patria potestad o la custodia legal de un menor, lo último que le queda a un padre o una madre es el derecho a las relaciones filiales, por más limitadas que estas puedan ser. Este puede ser el caso de padres o madres quienes, tras ser encarcelados, han perdido la patria potestad y la custodia legal de sus hijos. También es el caso del ex-cónyuge a quien, tras el divorcio, solo se le reconoce relaciones filiales.

Al respecto, es importante tener presente que tanto en Puerto Rico como en la jurisdicción federal, la relación entre padres e hijos está protegida constitucionalmente. Rexach v. Ramírez, 162 D.P.R. 130, 146 (2004). En Puerto Rico, los derechos de los padres con relación a sus hijos, la patria potestad, la custodia y las relaciones materno/paterno

filiales, se examinan bajo el marco del derecho constitucional a la intimidad y la dignidad de todo ser humano, ambos de origen explícito en nuestra Constitución. Art. II, Sec. 8, Const. E.L.A., L.P.R.A. Tomo 1. Rexach v. Ramírez, *supra*, págs. 143-144; García Santiago v. Acosta, 104 D.P.R. 321, 324 (1975). Recordemos que:

> [e]n la sociedad democrática organizada alrededor de los derechos fundamentales del hombre, el Estado ha de reducir a un mínimo su intervención con […] las relaciones de familia. La intromisión en la vida privada sólo ha de tolerarse cuando así lo requieran factores superantes de salud, seguridad pública o el derecho a la vida y a la felicidad del ser humano afectado. García Santiago v. Acosta, *supra*, pág. 324.

A nivel federal, los derechos de los padres se examinan primordialmente a la luz de la Decimocuarta Enmienda de la Constitución de los Estados Unidos que garantiza que ninguna persona sea privada de su vida, libertad o propiedad sin el debido proceso de ley. Enmda. XIV, Const. E.E.U.U., L.P.R.A. Tomo 1. Como es sabido, el debido proceso de ley tiene dos vertientes: la sustantiva y la procesal. Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1984). En la primera, se busca salvaguardar los derechos fundamentales de las personas requiriendo al Estado justificación al interferir con los mismos. Íd. En la segunda, el Estado debe garantizar que la interferencia con los intereses de libertad o propiedad de las personas se lleve a cabo a través de un procedimiento que sea justo e imparcial. Íd.

En particular, el derecho a la integridad familiar, establecer un hogar, procrearse y criar a los hijos se analiza tanto bajo la vertiente sustantiva como la procesal del debido

proceso de ley porque es un interés libertario fundamental protegido por la Decimocuarta Enmienda. De hecho, el Tribunal Supremo de los Estados Unidos ha expresado que: "[t]he liberty interest … of parents in the care, custody, and control of their children … is perhaps the oldest of the fundamental liberty interests recognized by this Court". Troxel v. Granville, 530 U.S. 57, 65-66 (2000); Santosky v. Kramer, 455 U.S. 745, 753-754 (1982); Stanley v. Illinois, 405 U.S. 645, 651-653 (1972); Pierce v. Society of Sisters, 268 U.S. 510, 535 (1925). Además, la Corte Suprema federal le ha otorgado protección a estos derechos al amparo de la cláusula de la igual protección de las leyes de la Decimocuarta Enmienda, el derecho de asociación consagrado en la Primera Enmienda[1] y la

---

[1] Sobre este particular la Corte Suprema de los Estados Unidos expresó:

> [T]he Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty.
>
> […]
>
> The personal affiliations that exemplify these considerations … are those that attend the creation and sustenance of a family—marriage; childbirth; the raising and education of children; and cohabitation with one's relatives. Family relationships, by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life. Roberts v. U.S. Jaycees, 468 U.S. 609, 618, 620-621 (1984).

Novena Enmienda. <u>Meyer v. Nebraska</u>, 262 U.S. 390, 399 (1923);
<u>Stanley v. Illinois</u>, *supra*, pág. 651; <u>Roberts v. United States
Jaycess</u>, 468 U.S. 609, 617-621 (1984); <u>Griswold v. Connecticut</u>,
381 U.S. 479, 496 (1965).

Así pues, los derechos que emanan de la maternidad y la
paternidad se consideran fundamentales en ambas jurisdicciones
ya que **"a natural parent's desire for and right to 'the
companionship, care, custody and management of his or her
children' is an interest far more precious than any property
right"**. <u>Santosky v. Kramer</u>, *supra*, pág. 759. (Énfasis suplido).

### B.      *Derechos de los niños*

Por otra parte, los hijos también ostentan derechos
frente a sus padres y el Estado. Por ejemplo, la Carta de
Derechos del Niño, Ley Núm. 338-1998 (1 L.P.R.A. sec. 412),
contiene un listado, no exhaustivo, cuyo propósito es destacar
la importancia que tiene la debida atención a los niños con el
fin principal de asegurar su bienestar y desarrollo pleno. De
especial importancia para el caso ante nuestra consideración,
destacamos los siguientes derechos enumerados en dicho
estatuto: (1) que se les garantice la vigencia efectiva de sus
derechos constitucionales y estatutarios; (2) vivir en un
ambiente adecuado en el hogar de sus padres; (3) no ser
separados de su hogar a menos que, a través de un proceso
judicial, se pruebe que la separación es para el bienestar y
mejor interés del menor; (4) ser protegidos por el Estado de
cualquier forma de maltrato o negligencia que provenga de sus
padres o de personas que los tengan bajo su cuidado; (5) ser
escuchados y recibir el debido reconocimiento en los procesos

judiciales que les afecten; (6) que se les designe un representante que vele por sus mejores intereses en los procesos judiciales sobre custodia y privación de la patria potestad tras ser víctimas de maltrato o negligencia; y (7) disfrutar del cuidado y protección del Estado cuando sus padres o familiares no cumplan con esa responsabilidad. Ley Núm. 338-1998, *supra.*

C.      *Deber de parens patriae del Estado y la intervención en casos de maltrato de menores*

Ahora bien, como se desprende de la Carta de Derechos del Niño, *supra*, el Estado tiene un deber de *parens patriae* que en ocasiones es superior a los derechos de patria potestad, custodia y relaciones filiales que los padres tienen sobre sus hijos menores de edad. Negrón v. Lugo, 59 D.P.R. 870, 875 (1942). En vista de que los menores son los sujetos jurídicos más vulnerables de nuestra sociedad, el Estado tiene autoridad para protegerlos cuando se convierten en víctimas de maltrato. Rivera Báez, Ex parte, 170 D.P.R. 678, 697 (2007). Cónsono con ello, a través de los años se han adoptado varios estatutos cuyo norte es asegurar la seguridad y el mejor bienestar de los menores y facilitar la intervención del Estado en casos de maltrato. Los estatutos pertinentes al caso de autos son la Ley Núm. 177, *supra*, estatuto vigente al momento de la remoción de las menores del hogar de la señora Cacho González y la Ley Núm. 246, *supra*, estatuto que entró en vigor durante el trámite apelativo de este caso y que derogó la Ley Núm. 177, *supra.*[2]

---

[2] Los hechos del caso de epígrafe se desarrollaron inicialmente al amparo de la Ley Núm. 177, *supra*. Bajo este estatuto el Departamento removió a las menores del hogar de su madre,

Surge del texto de la Ley Núm. 177, *supra*, que el Departamento de la Familia es la agencia gubernamental responsable de implantar la política pública enunciada en esta pieza legislativa. La ley establece la responsabilidad y obligación del Departamento de intervenir en casos de maltrato de menores y realizar los esfuerzos necesarios para fortalecer y mejorar la prevención, identificación, investigación y manejo de las situaciones de maltrato de menores. Con este fin, se le facultó para iniciar ante los tribunales los procedimientos que fuesen necesarios para proteger el bienestar de los menores. 8 L.P.R.A. secs. 440-450m. Actualmente, dicha obligación mantiene toda su vigencia según la nueva Ley Núm. 246, *supra*, con un leve cambio de enfoque el cual busca validar los derechos de los menores frente al de los padres y evitar que el mejor interés del menor sea postergado por los intereses de los padres, madres o custodios maltratantes. Véase Exposición de Motivos de la Ley Núm. 246, *supra*.

El procedimiento que debe llevar a cabo el Departamento es similar bajo ambos estatutos. En apretada síntesis, tras acudir al Tribunal de Primera Instancia para obtener la custodia legal provisional de un menor maltratado, el Departamento debe adoptar un Plan de Servicios y un Plan de Permanencia para proveer estabilidad y seguridad al menor y ofrecer atención

_____

adjudicó la custodia provisional y permanente, realizó esfuerzos razonables y consiguió el cese de esfuerzos de reunificación familiar. Por su parte, el Tribunal de Apelaciones basó su fallo revocatorio en la Ley Núm. 246, *supra*, pues esta entró en vigor durante el trámite apelativo. En vista de esto, nos referimos a ambos estatutos pero resolvemos las controversias planteadas al amparo de la Ley Núm. 246, *supra*. Véase, <u>Rivera Báez, Ex parte</u>, *supra*, pág. 696.

social al menor y su familia. Además, durante el proceso, el Departamento debe llevar a cabo esfuerzos razonables por un período de tiempo determinado para reunificar al menor con su familia. Esto pues, a pesar del cambio de enfoque, la primera alternativa sigue siendo la reunificación familiar. Exposición de Motivos de la Ley Núm. 246, *supra*. En los casos en que no sea posible la reunificación familiar, en aras de salvaguardar el bienestar y los intereses del menor involucrado, el Departamento puede iniciar un procedimiento de privación de la custodia legal, la patria potestad o ambos.

Esto está en armonía con nuestros pronunciamientos sobre los esfuerzos que debe realizar el Estado para facilitar la reunificación familiar: el "poder de *parens patriae* debe dirigirse, en su máxima plenitud a fomentar la integridad de la familia, propiciando aquellos sentimientos de amor, de seguridad y de existencia feliz que fluyen naturalmente en el hogar donde se nace". García Santiago v. Acosta, *supra*, págs. 324-325; Rivera Báez, Ex parte, *supra*, pág. 715. Es evidente, pues, la política a favor de la reunificación familiar y de la realización de esfuerzos razonables tendentes a este fin, limitada en todo caso por el bienestar y los mejores intereses de los menores. Estrella v. Figueroa, 170 D.P.R. 644, 661-662 (2007).

La exigencia de llevar a cabo esfuerzos razonables estriba en que: "[el derecho fundamental a que los padres se relacionen con sus hijos] se continúa reconociendo incluso cuando a los padres se les priva temporalmente de la custodia de sus hijos y cuando éstos no son del todo aptos para cuidar de los menores".

<u>Rexach v. Ramírez</u>, *supra*, pág. 146. Sin embargo, esta exigencia no puede ser llevada al extremo, por lo que el Departamento no está obligado a realizar esfuerzos razonables de forma indefinida y tampoco debe retener la custodia legal del menor por un largo período de tiempo. <u>Rivera Báez, Ex parte</u>, *supra*.

D.     *Estándar de prueba*

Como vemos, los procedimientos al amparo de la antigua Ley Núm. 177, *supra*, hoy la Ley Núm. 246, *supra*, pueden incidir permanentemente sobre los derechos fundamentales de los padres. Por ende, debemos examinar el estándar de prueba requerido cuando el Estado pretende ponerle fin a los mismos.

Ciertamente, las situaciones que involucran el maltrato de menores y la intervención del Estado con el núcleo familiar suscitan múltiples controversias que representan un gran reto tanto para las agencias gubernamentales a cargo de estos asuntos, como para los jueces que atienden estos casos. En particular, la tarea de los tribunales es una extremadamente difícil pues hay que hacer un balance fino entre los derechos y el bienestar de los menores y los derechos constitucionales de los padres.

Esta tarea se complica aún más ya que ninguna de las leyes examinadas ni la jurisprudencia de este Tribunal indican el estándar de prueba que el Estado debe satisfacer en este tipo de procedimiento. Esta realidad nos mantiene al margen de la jurisprudencia federal ya que, en 1982, la Corte Suprema de los Estados Unidos analizó el asunto. Veamos.

En <u>Santosky v. Kramer</u>, *supra*, el más alto foro federal decidió al crisol de la Decimocuarta Enmienda que **cuando el**

**Estado desea privar a sus ciudadanos, permanente e irrevocablemente, de los derechos constitucionales que emanan de la paternidad o la maternidad, lo tiene que hacer mediante la presentación de evidencia clara, robusta y convincente.** Esta decisión declaró inconstitucional la legislación del estado de New York que permitía que el Estado declarara no aptos ("unfit") a los padres mediante preponderancia de la evidencia en un procedimiento de terminación de los derechos de los padres.

Expresó la Corte Suprema: "**[a] majority of the States have concluded that a 'clear and convincing evidence' standard of proof strikes a fair balance between the rights of the natural parents and the State's legitimate concerns. We hold that such a standard adequately conveys to the factfinder the level of subjective certainty about his factual conclusions necessary to satisfy due process**". Santosky v. Kramer, *supra*, pág. 770. (Énfasis suplido) (Citas internas omitidas). Esta decisión se fundamentó, primordialmente, en las expresiones emitidas un año antes en Lassiter v. Department of Social Services, 452 U.S. 18, 27 (1981):

> [t]he fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures.

Por lo tanto, la garantía constitucional del debido proceso de ley impone al Estado el deber de presentar prueba clara, robusta y convincente sobre los hechos alegados cuando busca poner fin a los derechos que tienen los padres sobre sus hijos menores de edad.

Hemos reiterado en múltiples ocasiones que las protecciones que reconoce el Tribunal Supremo federal referentes a las disposiciones constitucionales aplicables a Puerto Rico constituyen el mínimo de protección que estamos obligados a reconocer al interpretar nuestra Carta de Derechos. Pueblo v. Díaz, Bonano, 176 D.P.R. 601, 621 (2009); Pueblo v. Meléndez Rodríguez, 136 D.P.R. 587, 598 (1994); U.N.T.S. v. Soler Zapata, 133 D.P.R. 153, 162-163 (1993). Por lo tanto, el estándar probatorio en procedimientos para ponerle fin a los derechos que emanan de la maternidad y la paternidad establecido en Santosky v. Kramer, *supra*, es el mínimo federal vinculante en nuestra jurisdicción.

Esta no sería la primera vez que se exige un estándar probatorio más riguroso para acciones civiles en nuestro ordenamiento jurídico. Se exige prueba clara, robusta y convincente para refutar la presunción de validez del voto emitido, para imponerle una medida disciplinaria a un miembro de la profesión legal y para demostrar malicia real o negligencia en casos de difamación. In re Caratini Alvarado, 153 D.P.R. 575 (2001); Clavell v. El Vocero de P.R., 175 D.P.R. 690 (1984); P.P.D. v. Administrador, 111 D.P.R. 199 (1981). Sobre este particular se ha establecido que: "**cuando se trata de la negación de un derecho fundamental… el debido proceso de**

**ley exige que el valor y suficiencia de la prueba sean medidos con un criterio más riguroso que el de la preponderancia de la prueba**". In re Caratini Alvarado, *supra*, pág. 584. (Énfasis suplido). Sin duda, los derechos constitucionales en pugna en procedimientos al amparo de la Ley Núm. 246, *supra*, son comparables, o incluso, superan aquellos envueltos en los casos en que hemos adoptado el estándar de prueba intermedio. Consiguientemente, por mandato constitucional, también procede su aplicación.

### E. Aplicabilidad del estándar de prueba clara, robusta y convincente en nuestro ordenamiento

Dado el intenso debate generado en torno a la sabiduría de la decisión federal en Santosky v. Kramer, *supra*,[3] conviene hacer varias aclaraciones sobre la aplicabilidad del estándar probatorio de prueba clara, robusta y convincente a casos como el de autos.[4] Por un lado, como estamos en un caso donde el

---

[3] Véase, por ejemplo, R. Mandel, The Evidence is "Clear and Convincing": *Santosky v. Kramer* Is Harmful to Children, 26(4) Child. Legal Rts. J. 1 (2006); M. Levine, Do Standards of Proof Affect Decision Making in Child Protection Investigations? 22 Law & Hum. Behav. 341 (1998); M. Rizzo, The Economics of Termination of Parental Rights: Santosky v. Kramer, 2 Sup. Ct. Econ. Rev. 277 (1983); J. Burns, Family Law II, 1983 Ann. Surv. Am. L. 1013 (1983); B. Shulman, Fourteenth Amendment: The Supreme Court's Mandate for Proof Beyond a Preponderance of the Evidence in Terminating Parental Rights, 73 J. Crim L. & Criminology, 1595 (1982); R. Wainger, Santosky v. Kramer: Clear and Convincing Evidence in Actions to Terminate Parental Rights, 36 U. Miami L. Rev. 369 (1982).

[4] En Rivera v. Minnich, 483 U.S. 574, 582 (1987), el Tribunal Supremo federal negó extender este estándar probatorio a los procedimientos de filiación. Basó su determinación en la diferencia inherente entre un procedimiento que busca ponerle fin a los derechos existentes de los padres con respecto a sus hijos y aquellos que buscan la imposición de los deberes y obligaciones que emanan de la paternidad y la maternidad. Le dio especial importancia a que: "'natural parents have no 'double jeopardy' defense' against the State´s repeated efforts to terminate parental rights … The imposition of a higher

Estado busca privar a una madre de sus derechos constitucionales con relación a sus hijas, no procede expresarnos sobre el estándar probatorio aplicable en un pleito civil sobre relaciones de familia entre partes privadas. Como bien señala la Corte Suprema de los Estados Unidos "we have repeatedly noticed what sets parental status termination decrees apart from mine run civil actions, even from other domestic relations matters such as divorce, paternity, and

---

standard of proof protects the parents, and to some degree the child, from renewed efforts to sever their familial ties. In contrast, a paternity suit terminates with the entry of a final judgment that bars repeated litigation of the same issue under normal principles of civil litigation". Rivera v. Minnich, supra, pág. 582. (Citas internas omitidas).

child custody". M.L.B. v. S.L.J., 519 U.S. 102, 127-128 (1996).[5]

_____

[5] La distinción entre los casos civiles de familia entre partes privadas y procedimientos de terminación de los derechos de los padres instados por el Estado también ha sido objeto de debate. Véase, por ejemplo, la Opinión disidente del Juez Clarence Thomas en M.L.B. v. S.L.J., *supra*, págs. 141-142. ("The distinction that the majority seeks to draw between the case we confront today and the other civil cases that we will surely face tomorrow is far more ephemeral … The majority seeks to provide assurances that its holding will not extend beyond parental termination suits. The holdings of *Santosky* and *Lassiter* —both of which involved parental termination— have not, we are told, been applied to other areas of law. This is not comforting. Both *Santosky* and *Lassiter* are cases that determined the requirements of due process (not equal protection) in the parental rights termination area. As the Court has said countless times, the requirements of due process vary considerably with the interest involved and the action to which it is subject. It is little wonder, then, that the specific due process requirements for one sort of action are not readily transferable to others. I have my doubts that today's opinion will be so confined". (Citas internas omitidas).

Véase, además, J. Wriggins, Parental Rights Termination Jurisprudence: Questioning the Framework, 52 S. C. L. Rev. 242, 253-254, 261 (2000-2001)("The majority opinion in *M.L.B.* sharply distinguishes between adjudication of child custody disputes between parents and termination of parental rights adjudication. The state's role in these two situations, by implication, is also significantly different … Decisions terminating parental rights must be based on clear and convincing evidence, while parents' disputes over child custody, like other civil cases, are decided based on a preponderance of the evidence … However … the two situations are not necessarily different with respect to the impact of custody orders on indigent parents … This distinction may not be as great as it seems … [A] stronger explanation is needed to explain why the constitutional protections that apply to litigation of termination of parental rights do not apply to parental disputes about child custody". (Citas internas omitidas).

Por otro lado, a diferencia del esquema regulador analizado en Santosky v. Kramer, *supra*, tanto la Ley Núm. 177, *supra*, como la Ley Núm. 246, *supra*, proveen un mecanismo ambiguo y poco abarcador dado las numerosas y variadas situaciones que pueden surgir durante este tipo de procedimiento. Ninguna es clara en cuanto al procedimiento para la terminación de los derechos de los padres y sus efectos.[6] Además, no proveen, expresamente, para un proceso bifurcado como el estatuto de Nueva York analizado en Santosky v. Kramer, *supra*. Por tal razón, es necesario llevar a cabo un análisis integral de la Ley Núm. 246, *supra*, para delinear cuándo el Estado debe estar sujeto al estándar probatorio de prueba clara, robusta y convincente.

De entrada, debemos señalar que el estándar de prueba clara, robusta y convincente solo aplica cuando el Estado pretenda ponerle fin a los derechos constitucionales que emanan

_____

Por tal razón, hay Estados que por legislación o jurisprudencia han adoptado un estándar probatorio más riguroso al de preponderancia a ciertos casos civiles entre partes privadas cuando están involucrados los derechos de los padres. Véase, Gabriel v. Pritchard, 173 Vt. 452788 A.2d 1 (Vt. 2001), citando a Mullin v. Phelps, 162 Vt. 250647 A.2d 714, 721 (Vt. 1994); In re Marriage of Jones, 160 Ill. App. 3d 593 (1987)(Refiriéndose a la sección 610(b) del *Marriage and Dissolution of Marriage Act* de Illinois, Ill. Rev. Stat. 1985, ch. 40, par. 610(b)).

[6] La legislación sobre este particular y las razones para poder ponerle fin a los derechos de los padres varía de estado en estado. D. Kramer, Legal Rights of Children, Vol. 3, 2nd Ed. § 28.02 (1995). No obstante, "[r]egardless of whether the termination statues focus on harm to the child or on parental inadequacies, they lead to termination of parents' custodial rights". H. Sigmond, Involuntary Termination of Parental Rights: The Need for Clear and Convincing Evidence. 22 Am. Univ. L. Rev. 771, 779 (1980); S. Morgan, Child Custody & Visitation, Vol. 4, §28.02[1] (2012).

de la paternidad y maternidad. Este estándar probatorio más riguroso no aplica a la intervención de emergencia e inmediata del Departamento con la custodia o las relaciones paterno/materno-filiales de forma **provisional y temporera**. Así pues, los procedimientos al amparo del Art. 23 sobre custodia de emergencia, el Art. 37 sobre procedimientos de emergencia y el Art. 39 sobre la vista de ratificación de la custodia legal provisional, están sujetos al estándar de preponderancia. 8 L.P.R.A. seccs. 1133, 1147, 1149. Por el contrario, para que el tribunal pueda privar permanentemente a los padres de la patria potestad, la custodia o las relaciones materno/paterno filiales sobre sus hijos menores de edad, deberá estimar probadas las alegaciones del Estado mediante prueba clara, robusta y convincente, según requerido constitucionalmente.

Ahora bien, según expuesto anteriormente, la Ley Núm. 246, *supra*, exige al Departamento realizar esfuerzos razonables de reunificación familiar. También establece una serie de situaciones en las que el Departamento no tiene que realizarlos y otras que ameritan el cese de los mismos. Por ello, debemos analizar si el Estado debe estar sujeto al estándar más riguroso en esta etapa de los procedimientos. Para esto, es útil examinar el estatuto de Nueva York analizado por la Corte Suprema federal en Santosky v. Kramer, *supra.*

Bajo el estatuto de Nueva York, en los procedimientos de terminación de los derechos de los padres, el Estado debía probar, durante la fase de determinación de hechos, una serie de alegaciones mediante preponderancia. En esencia:

[a]t the factfinding hearing, the State must establish, among other things, that for more than a year after the child entered state custody, the agency 'made diligent efforts to encourage and strengthen the parental relationship.' The State must further prove that during that same period, the child´s natural parents failed ´substantially and continuously or repeatedly to maintain contact with or plan for the future of the child although physically and financially able to do so.´ Should the State support its allegations by 'a fair preponderance of the evidence´, the child may be declared permanently neglected.

[…]

The State seeks to establish a series of historical facts about the intensity of its agency's efforts to reunite the family, the infrequency and insubstantiality of the parents´ contact with their child, and the parents´ inability or unwillingness to formulate a plan for the child's future.

[…]

The factfinding does not purport – and is not intended – to balance the child's interests in a normal family home against the parents' interest in raising the child. Nor does it purport to determine whether the natural parents or the foster parents would provide the better home. Rather, the factfinding hearing pits the State directly against the parents. The questions disputes and decided are what the State did – 'made diligent efforts,' – and what the natural parents did not do – 'maintain contact with or plan for the future of the child.' The State marshals an array of public resources to prove its case and disprove the parents' case. **Victory by the State not only makes termination of parental rights possible; it entails a judicial determination that the parents are unfit to raise their own children.** Santosky v. Kramer, *supra*, págs. 748-749, 762, 759-760. (Citas internas omitidas). (Énfasis suplido).

Analizado lo anterior, el Tribunal Supremo concluyó que el estándar estatutario de preponderancia para esta etapa no era constitucional dado que una vez el Estado probara estas alegaciones podía entonces terminar permanente e irrevocablemente los derechos de los padres sobre sus hijos.

Determinó que el estándar más riguroso de prueba clara, robusta y convincente balanceaba adecuadamente los derechos constitucionales de los padres y los intereses legítimos del Estado. Santosky v. Kramer, *supra*, pág. 700.

Tras la declaración de inconstitucionalidad, las secciones pertinentes de la legislación del estado de Nueva York fueros modificadas. **La sección sobre la vista de determinación de hechos ahora dispone que el Estado debe probar mediante prueba clara, robusta y convincente, entre otros hechos, que se han realizado esfuerzos diligentes para fomentar y fortalecer la relación paternal y especificar cuáles han sido estos esfuerzos o que realizarlos sería detrimental para el mejor bienestar del menor y especificar las razones para llegar a esa conclusión.** N.Y. FCT. Law secs. 614, 622.[7] Luego de cumplir con este estándar de prueba, se celebra la vista dispositiva en la cual, utilizando el criterio del mejor bienestar del menor, se determina en dónde ubicar al menor y el plan de permanencia a seguir. N.Y. FCT. Law secs. secc. 631.[8]

---

[7] Otras jurisdicciones requieren que el estado pruebe este tipo de alegaciones mediante prueba clara, robusta y convincente también. A modo de comparación, el estatuto de Colorado permite la terminación de los derechos de los padres si la corte determina mediante este estándar más riguroso: (1) que los padres no cumplieron razonablemente con el Plan de Tratamiento aprobado por la corte o que el mismo fue inefectivo; (2) que los padres son 'unfit'; y (3) que es improbable que la conducta de los padres cambie dentro de un tiempo razonable. C.R.S. sec. 19-3-604(1). "Prior to termination of the parent's rights to the child, the parent must be shown to have failed to achieve the goals set out in the treatment plan before termination can be approved". Kramer, op. Cit. § 28.15. Véase también, S. Morgan, Child Custody & Visitation, Vol. 4, §28.02[1][o] (2012).

[8] El estándar de prueba requerido en la parte dispositiva de estos procedimientos no fue directamente atendido por la Corte Suprema en Santosky v. Kramer, *supra*. Por tal razón, el

El hecho de que en la vista de determinación de los hechos se prueben las causales para ponerle fin a los derechos de los padres no implica que la corte esté obligada a hacerlo. "[E]ven if such allegations of the petition are proven, [mediante el estándar de prueba clara, robusta y convincente] the court is not required to terminate parental rights. Instead, a dispositional hearing is held on the question of what disposition (*i.e.* termination, dismissal of proceedings, suspended judgment) would be in the best interest of the child". S. Morgan, Child Custody & Visitation, Vol. 4, § 28.04[1] (2012). Es decir, en la parte dispositiva, la corte puede otorgar otros remedios basados en el mejor bienestar del menor. A tales efectos, puede suspender o posponer el procedimiento, ubicar al menor con un recurso familiar sin ponerle fin a todos los derechos de los padres sobre sus hijos, entre otros. N.Y. FCT. Law secs. 632-634. Los diferentes remedios estaban reconocidos al momento en que se decidió Santosky v. Kramer, *supra*. Esto es así en otras jurisdicciones también. D. Kramer, Legal Rights of Children, Vol. 3, 2nd Ed. § 28.05.[9]

_____

estándar probatorio para esta etapa procesal varía de estado en estado. Véase sobre este particular, A. Haralambie, Handling Child Custody, Abuse and Adoption Cases, Vol. 2, 3rd. Ed., 659-662 (2009); Kramer, op. cit., §§ 28.02, 28.15; B. Hill, The State's Burden of Proof at the Best Interests State of a Termination of Parental Rights, 2004 U. Ch. Legal F. 557, 565-567 (2004); Sigmond, *supra*, 781-782.

[9] Ello responde, en parte, al reconocimiento de que no toda situación en la que el Estado busca ponerle fin a los derechos de los padres es igual. En muchas ocasiones, "[a]t the time of the termination proceeding, plans for the future of the child may or may not have been formulated and, if formulated, may not include an immediate adoption into a new family unit". Morgan, op. cit., § 28.01. Incluso, como en el caso de autos,

En nuestro caso, el Art. 3 de la Ley Núm. 246 define

esfuerzos razonables como:

> todas aquellas acciones, actividades y servicios que
> se ofrecen para asistir, desarrollar y fomentar una
> relación valiosa entre el padre, a [sic] la madre o
> persona responsable de un menor y a los propios
> menores dentro y fuera del hogar … Los esfuerzos
> razonables van dirigidos a evitar la remoción de los
> menores de su familia, reunificar la misma y lograr
> una alternativa de hogar permanente cuando no sea
> posible la reunificación familiar. 8 L.P.R.A. sec.
> 1101.

Esta definición es similar a la establecida en la derogada Ley

Núm. 177, *supra*.[10] Los referidos esfuerzos se deben llevar a

cabo posterior a la remoción del menor de su hogar. No

obstante, de estar presentes alguna o varias de las situaciones

establecidas en el Art. 49 de la Núm. 246, *supra*, equivalente

al Art. 50 de la derogada Ley Núm. 177, *supra*, el Departamento

no está obligado a realizar los esfuerzos razonables de

reunificación familiar o, de haberlos provisto, puede solicitar

el cese de los mismos.[11] Tras una determinación a estos

efectos, el tribunal celebrará una vista de permanencia para

determinar dónde se ubicará al menor. Íd.

_____

frecuentemente "the termination of parental rights may be sought against one parent and not the other". Íd., § 28.01[2]; Haralambie, op. cit., 656.

[10] El Art. 2 de la Ley Núm. 177, *supra*, definía esfuerzos razonables como: "todas aquellas actividades y servicios que se ofrecen al padre, a la madre o persona responsable de un/a menor y a los propios menores dentro y fuera del hogar, en coordinación con entidades públicas y privadas, para garantizar su seguridad y bienestar. Estos esfuerzos van dirigidos a evitar la remoción de los/as menores de su familia, reunificar la misma y lograr una alternativa permanente de ubicación cuando no sea posible la reunificación familiar."

[11] Incluso, la propia ley dispone que, de estar presente alguna de las situaciones de los incisos (d) al (m), "el tribunal no tendrá discreción y deberá relevar de esfuerzos al Departamento". 8 L.P.R.A. 1159.

Al examinar las disposiciones referentes a las determinaciones relacionadas con los esfuerzos razonables, es forzoso concluir que estas son determinantes y permiten al Departamento privar a los padres, permanentemente, de la patria potestad sobre sus hijos menores de edad, la custodia legal y las relaciones materno/paterno filiales. Por tal razón, esta etapa se puede equiparar al "factfinding phase" del estatuto de Nueva York. Veamos.

Por un lado, y con respecto a los procedimientos de privación permanente de la custodia legal de los padres, el Art. 42 de la Ley Núm. 246, *supra*, provee para una vista de disposición en la cual, **luego de determinar que no es viable el regreso del menor al hogar de donde fue removido o a un hogar de un familiar, se le otorgará la custodia permanente al Departamento o se podrá iniciar el procedimiento para la privación de la patria potestad**. 8 L.P.R.A. sec. 1152. Por su parte, el Art. 49 sobre esfuerzos razonables establece que la referida vista de permanencia se debe llevar a cabo dentro de los 15 días siguientes a la determinación de que no proceden los esfuerzos razonables o que estos deben cesar. 8 L.P.R.A. sec. 1159. Cónsono con lo anterior, el Art. 52 permite que el Departamento inicie el procedimiento de privación de la patria potestad cuando:

[…]

(b) **El Tribunal ha hecho una determinación conforme a las disposiciones de esta ley de que no procede realizar esfuerzos razonables y ordena que no se presten servicios de reunificación.**

[…]

(c) **El Tribunal determina que el padre y/o la madre no ha hechos esfuerzos de buena fe para rehabilitarse y reunirse con el menor.** 8 L.P.R.A. sec. 1162. (Énfasis suplido).

Finalmente, el Art. 53 establece que: "una vez advenga final y firme la privación de la patria potestad, el Departamento podrá iniciar inmediatamente el proceso de adopción". 8 L.P.R.A. sec. 1163.

**Ciertamente, el relevo o cese de esfuerzos razonables de reunificación familiar es concluyente cuando el Departamento se propone privar a los padres de la patria potestad, la custodia o las relaciones materno/paterno-filiales.** Analizados en conjunto estos artículos, es indiscutible que la determinación sobre la procedencia de esfuerzos razonables de reunificación familiar o el decreto de cese de los mismos, al igual que en la legislación del estado de Nueva York, tiene como consecuencia inmediata la posible terminación permanente de los derechos constitucionales de los padres. Por tal razón, el debido proceso de ley exige al Estado probar, mediante prueba clara, robusta y convincente, los hechos que justifican decretar el relevo o el cese de esfuerzos razonables de reunificación familiar.

## III.

Con este marco doctrinal, pasemos a examinar detenidamente las tres controversias ante nuestra consideración, a saber: (1) la admisibilidad del testimonio pericial de la doctora Cardalda y el alcance del descubrimiento de prueba; (2) el decreto de cese de esfuerzos razonables de reunificación familiar; y (3)

la concesión de relaciones materno-filiales a la señora Cacho González.

A.      *Admisibilidad del testimonio de la doctora Cardalda y el alcance del descubrimiento de prueba*

En cuanto a la admisibilidad del testimonio de la doctora Cardalda, resulta aplicable el Art. 34 de la Ley Núm. 246, *supra*, antes el Art. 34 de la Ley Núm. 177, *supra*, que establece que:

> [e]n los procedimientos por maltrato, maltrato institucional, negligencia y/o negligencia institucional de un menor al amparo de esta Ley, no existirá privilegio en las comunicaciones, según se dispone en las Reglas de Evidencia de Puerto Rico, excepto las de abogado-cliente. Dicha comunicación privilegiada, excluyendo las de abogado-cliente, no constituirá razón para dejar de ofrecer informes como los que requiere o permite esta Ley, para cooperar con el servicio de protección al menor en las actividades que contempla esta Ley o para poder aceptar u ofrecer evidencia en cualquier procedimiento judicial relacionado con el maltrato, maltrato institucional, maltrato por negligencia y/o maltrato por negligencia institucional hacia un menor.

Contrario a lo señalado por el foro intermedio, lo resuelto en Ortiz v. Meléndez, *supra*, es distinguible del caso de referencia. En Ortiz, este Tribunal resolvió que un psicoterapeuta que ofrece tratamiento a un menor cuya custodia está en disputa no puede luego testificar en el pleito de custodia, por ser esta comunicación privilegiada según las Reglas de Evidencia. No obstante, nos encontramos ante un procedimiento instado por el Estado al amparo de legislación especial sobre maltrato de menores. Esta legislación especial específicamente dispone que, salvo una limitada excepción, los privilegios evidenciarios no pueden ser invocados en este tipo de procedimiento. Art. 34 de la Ley Núm. 246, *supra*. Por lo

tanto, es forzoso concluir que por virtud del principio de hermenéutica que establece que una ley de carácter especial prevalece sobre otra de carácter general, el testimonio de la doctora Cardalda era admisible. Art. 12 del Código Civil, 31 L.P.R.A. sec. 12.

No obstante, nos vemos precisados a distinguir la admisibilidad de un testimonio pericial de su valor probatorio. La Regla 702 de Evidencia, 32 L.P.R.A. Ap. VI, regula la admisibilidad y valor probatorio de testimonio pericial. Esta dispone que:

> Cuando conocimiento científico, técnico o especializado sea de ayuda para la juzgadora o el juzgador poder entender la prueba o determinar un hecho en controversia, una persona testigo capacitada como perita -conforme a la Regla 703 de este apéndice- podrá testificar en forma de opiniones o de otra manera.
>
> El valor probatorio del testimonio dependerá, entre otros, de:
>
>> (a)   si el testimonio está basado en hechos o información suficiente;
>>
>> (b)   si el testimonio es el producto de principios y métodos confiables;
>>
>> (c)   si la persona testigo aplicó los principios y métodos de manera confiable a los hechos del caso;
>>
>> (d)   si el principio subyacente al testimonio ha sido aceptado generalmente en la comunidad científica;
>>
>> (e)   las calificaciones o credenciales de la persona testigo; y
>>
>> (f)   la parcialidad de la persona testigo.
>
> La admisibilidad del testimonio pericial será determinada por el Tribunal de conformidad con los factores enumerados en la Regla 403 de este apéndice.

Así pues, para determinar la admisibilidad del testimonio de la doctora Cardalda se debe determinar si cumple con el análisis requerido por la Regla 403 de Evidencia, 32 L.P.R.A. Ap. VI, y si su testimonio sería de ayuda para el juzgador. Entendemos que su testimonio cumple con estos requisitos, por lo cual es admisible. Sin embargo, el hecho de que el testimonio de la doctora Cardalda sea admisible en evidencia, no determina el valor probatorio de su testimonio de acuerdo a la Regla 702 de Evidencia, *supra*, y su jurisprudencia interpretativa.

Vinculado a lo anterior, es necesario hacer unos pronunciamientos breves en torno al alcance del descubrimiento de prueba. Surge del expediente que, una vez la señora Cacho González contrató los servicios de la doctora Lucca Irizarry como perita asesora, esta presentó una Solicitud de Producción de Documentos y Objetos al amparo de las Reglas de Procedimiento Civil, 32 L.P.R.A. Ap. V, y el Art. 49 de la Ley Núm. 177, *supra*. La solicitud incluía, entre otros, los informes, notas, expedientes, registro de reuniones y planes de trabajo de la doctora Cardalda y la trabajadora social De Jesús Juarbe. No obstante, tras un intercambio de varios escritos argumentativos entre las partes, el Tribunal de Primera Instancia dispuso que: "[e]l Departamento de la Familia descubrirá únicamente aquello que por ley y jurisprudencia se permite en casos de Ley 177". Apéndice del *Certiorari* del Procurador General, pág. 985.

Esto, sin duda, no resolvió la controversia entre la partes y dejó al arbitrio del Departamento la interpretación de

la ley sobre cuáles documentos debía producir. En vista de esto, la doctora Lucca Irizarry tuvo que testificar basándose únicamente en los informes oficiales rendidos al tribunal por los diferentes recursos del Departamento y sus respectivos *currículum vítae*. Ello pudo haber limitado la oportunidad de la señora Cacho González de impugnar efectivamente la prueba pericial presentada en su contra por el Departamento. El Tribunal de Apelaciones, por su parte, optó por otorgar "acceso al expediente" a la parte recurrida. Es decir, tampoco llevó a cabo un análisis ponderado sobre a cuáles documentos y objetos en manos del Departamento debía tener acceso la señora Cacho González y a cuáles no. Dado estos escuetos dictámenes, no estamos en posición de evaluar los fundamentos, si alguno, de las respectivas decisiones de los foros inferiores, por lo que el Tribunal de Primera Instancia debe atender adecuadamente la controversia sobre el alcance del descubrimiento de prueba de acuerdo a la Ley Núm. 246, *supra*, las Reglas de Procedimiento Civil, *supra*, las Reglas de Evidencia, *supra*, y la jurisprudencia de este Tribunal sobre este particular.

### B.    Cese de esfuerzos razonables

En el caso ante nos, las vistas de cese de esfuerzos razonables se llevaron a cabo entre septiembre y noviembre de 2010.[12] Surge del expediente que el Tribunal de Primera

---

[12] Para ese momento, el Art. 50 de la Ley Núm. 177, *supra*, disponía, en su parte pertinente, que:

> 3) No se harán esfuerzos razonables para reunir a un menor con su padre, madre o persona responsables de este en las siguientes circunstancias:

[…]

Instancia fundamentó el cese de esfuerzos razonables en los incisos 3(f), 3(g) y 3(j) del Art. 50 de la Ley Núm. 177, *supra*. Bajo el inciso 3(f) y 3(g), el Departamento puede cesar de realizar esfuerzos si el padre, la madre o persona responsable del menor incurre en conducta que, de procesarse por la vía criminal, constituirían los delitos enumerados en el Art. 50 2(e) según definidos en el Código Penal de Puerto Rico o si el padre, la madre o persona responsable del menor fuera coautor, encubriere o conspirara para cometer alguno de estos delitos.

No obstante, como bien señala el Tribunal de Apelaciones, esta determinación del foro primario fue errónea pues no se

_____

(f) El padre, la madre o persona responsable del menor incurre en la conducta o las conductas que se especifican en el inciso (e) y (f) de la sección 2 del presente Artículo. [A su vez, los incisos (e) y (f) mencionados disponen lo siguiente:

[…]

(e) El padre, la madre o persona responsable del menor incurre en conducta o conductas que, de procesarse por la vía criminal, constituirían los delitos de: asesinato en primer grado o segundo grado, agresión en su modalidad agravada menos grave o agravada grave, mutilación […] incitación a un menor para cometer un delito.

(f) El padre, la madre o persona responsable del menor que fuera co-autor, encubriere o conspirare para cometer uno o varios de los delitos enumerados en el inciso (e) anterior, según definidos por … el Código Penal de Puerto Rico].

(g) El padre, la madre o persona responsable del menor incurre en conducta que de procesarse por la vía criminal constituiría delito al ayudar, intentar, conspirar, solicitar o aconsejar a la comisión de delitos que atentan contra la salud e integridad física, mental, emocional del menor […].

desfiló prueba tendente a demostrar que la señora Cacho González fuera coautora o que esta encubriera o conspirara para matar a su hijo L.G.C. Hasta el momento, la señora Cacho González tampoco ha sido encausada penalmente por ser autora, coautora, encubridora o conspiradora de los hechos que rodearon la muerte de su hijo L.G.C. El Tribunal de Primera Instancia dedujo que la señora Cacho González había incurrido en la conducta mencionada simplemente porque esta no ha podido explicar la forma en que ocurrió la muerte del menor L.G.C. y por la alegada manipulación ejercida sobre las menores para que estas no divulguen lo ocurrido la noche del asesinato. Erró al así proceder.

Con relación al inciso 3(j) del Art. 50 de la Ley Núm. 177, *supra*, este se incluyó con el propósito de permitir al tribunal decretar el cese de los esfuerzos si a la luz de la totalidad de las circunstancias determinaba que continuar dichos esfuerzos no es en el mejor bienestar del menor. Esta enmienda entró en vigor el 17 de diciembre de 2010, luego de celebradas las vistas del caso de autos. Por tal razón, coincidimos con el foro intermedio en que el Tribunal de Primera Instancia no debió determinar, sin recibir prueba, que a la luz de la totalidad de las circunstancias el cese de esfuerzos de reunificación familiar redundaría en el mejor bienestar de las menores. La señora Cacho González no tuvo oportunidad de presentar su posición sobre este nuevo criterio añadido a la ley luego de la celebración de las vistas. Por el contrario, fue mediante una Moción Informativa presentada por el Departamento que el foro de primera instancia tuvo ante su

consideración este nuevo inciso. Aunque los casos de esta naturaleza están revestidos del más alto interés público y corresponde a los tribunales velar por el bienestar de los menores, ello no debe servir de justificación para violar derechos fundamentales como el derecho a un procedimiento justo e imparcial en donde se garantice el debido proceso a todas las partes. Cleveland Bd. of Educ. v. Loudermill, *supra*; Hernández González v. Secretario, 164 D.P.R. 390, 395-396 (2005).

A base de lo anterior, es forzoso concluir que procede la celebración de una nueva vista de cese de esfuerzos razonables en la cual la señora Cacho González tenga todas las garantías que le cobijan bajo la Constitución federal y nuestra Constitución. Como ya adelantamos, somos del criterio que por imperativo constitucional, el Estado debe estar sujeto al estándar de prueba clara, robusta y convincente en esta vista.

    *C.    Concesión de relaciones materno-filiales*

En el caso ante nos, los padres, bajo la supervisión del Departamento, continuaron relacionándose con las menores mientras estas estuvieron en el hogar de su tía-abuela materna. El 30 de marzo de 2010, en la vista sobre la Petición de Emergencia, la señora Cacho González **se allanó a que la remoción de las menores fue conforme a derecho y se suspendieron, provisionalmente, las relaciones filiales**. Luego, en la vista de ratificación, la señora Cacho González volvió a expresar que, aunque cuestionaba la determinación de negligencia que surgía del Informe de Intervención de la trabajadora social, estaba de acuerdo con la reubicación de las menores y con que se actuó debidamente con la remoción inicial.

Por tal razón, se ratificó que la remoción de las menores fue conforme a derecho y se mantuvo la suspensión provisional de las relaciones materno-filiales.

El 14 de junio de 2010, la señora Cacho González presentó la primera de varias solicitudes de relaciones materno-filiales. En la misma, adujo que llevaba más de tres meses cumpliendo con el Plan de Servicios preparado por el Departamento por lo que deseaba que se restableciera la comunicación con sus hijas. La segunda solicitud fue presentada el 20 de julio de 2010; la tercera, luego de que las menores, en noviembre de 2010, expresaran ante el foro primario el deseo de ver a su madre. El Departamento y la Procuradora Especial se opusieron a todas las solicitudes.

A raíz de esto, el Tribunal de Primera Instancia solicitó al Departamento que evaluara la posibilidad de permitir las relaciones materno-filiales. En cumplimiento con dicha orden, el Departamento presentó una Moción Informativa en la que expuso que el equipo multidisciplinario del Programa Biosicosocial recomendaba que, por el momento, las menores no se relacionaran con su madre, pero que las relaciones materno-filiales no se descartaban en un futuro. La señora Cacho González entonces solicitó acceso al Informe del Programa Biosicosocial[13] en dos ocasiones, reiteró su solicitud de relaciones materno-filiales y requirió la celebración de una vista para que el tribunal dilucidara el asunto.

---

[13] Este Informe no fue incluido como Anejo en ninguna de las peticiones de *certiorari* por lo que no ha podido ser evaluado por este Tribunal.

El 30 de diciembre de 2010, sin la celebración de una vista sobre el particular, el foro primario dictó una Orden declarando No ha Lugar a la petición de la señora Cacho González. En la misma consignó: "[e]l tribunal le requirió al Departamento de la Familia que evaluara la posibilidad de relaciones materno-filiales. Estos informaron que el Programa Biosicosocial que da servicios a las menores no las recomiendan favorables". La señora Cacho González solicitó la revisión de esta determinación, pero el Tribunal de Apelaciones denegó la expedición del *certiorari*. Por consiguiente, la suspensión provisional siguió vigente hasta el 8 de marzo de 2011 cuando el Tribunal de Primera Instancia, mediante la resolución recurrida, prohibió totalmente las relaciones materno-filiales y con el resto de la familia materna.

De este tracto procesal se puede colegir que la señora Cacho González se allanó, inicialmente, a la **suspensión provisional** de las relaciones materno-filiales mientras completaba el Plan de Servicios preparado por el Departamento. Tras someterse al referido plan, esta comenzó a solicitar nuevamente algún tipo de contacto con las menores, aunque fuera mediante visitas supervisadas. No obstante, el Tribunal de Primera Instancia, en parte por las alegaciones de que la señora Cacho González "no internalizó" el Plan de Servicios, optó por denegar las múltiples solicitudes sin celebrar una vista.

Un examen minucioso del expediente del caso demuestra que la prueba desfilada se ha centrado en dos aspectos: (1) privar a la señora Cacho González de la custodia legal de las menores

y (2) conceder al Departamento el cese de los esfuerzos de reunificación familiar. Además, no surge del expediente que se haya desfilado prueba sobre los efectos que podrían tener las relaciones materno-filiales mediante visitas supervisadas. Tanto la doctora Cardalda como la trabajadora social De Jesús Juarbe se limitaron a argumentar, de manera muy general, que conceder relaciones materno-filiales expondría a las menores a manipulación y abuso psicológico. No hubo ponderación alguna sobre diferentes alternativas que podrían minimizar estos alegados riesgos sin tener que prohibir todo tipo de contacto entre las menores y su madre y el resto de la familia materna. Por ello, debemos concluir que erró el Tribunal de Primera Instancia al mantener la prohibición total de las relaciones materno-filiales impuesta desde el 30 de marzo de 2010 y extenderla al resto de la familia materna.

Es importante resaltar que no es lo mismo demostrar que el mejor bienestar del menor se salvaguarda removiendo la custodia a un padre o madre maltratante o que se decrete el cese de esfuerzos razonables que debe realizar el Departamento, a que se examine el beneficio o no de establecer algún tipo de relaciones filiales, como lo serían visitas supervisadas. Enfatizamos que este derecho solo puede prohibirse cuando existan causas graves que lo justifiquen pues, en nuestro ordenamiento, las relaciones filiales deben evaluarse lo más liberalmente posible. Sterzinger v. Ramírez, *supra*, pág. 775; Centeno Alicea v. Ortiz, *supra*, pág. 527; Gorbea v. Látimer, *supra*. En ausencia de la patria potestad o la custodia legal de

un menor, lo último que le queda a un padre o una madre es el derecho a las relaciones filiales.

Reiteramos que para que el Estado pueda intervenir con los derechos que emanan de la maternidad y la paternidad de forma permanente, este debe probar los hechos que dan pie a la intervención mediante prueba clara, robusta y convincente por exigencia constitucional. A pesar de que la señora Cacho González se allanó al proceso en un principio, el Departamento debía cumplir con el aludido estándar cuando se propuso suspender las relaciones materno-filiales permanentemente. Recordemos que cuando la señora Cacho González se allanó a la remoción, las circunstancias eran distintas: las menores, inicialmente, iban a ser ubicadas en casa de su tía-abuela materna y esta medida era de carácter provisional.

Por su parte, el Tribunal de Apelaciones erró al ordenar las relaciones materno-filiales sin llevar a cabo un análisis sobre los posibles efectos de esta determinación. Por ende, estamos de acuerdo con que procede la celebración de una vista para determinar si procede reanudar las relaciones materno-filiales o si procede mantener la suspensión provisional establecida en el 2010. Según discutido previamente, el Estado debe estar sujeto al estándar de prueba clara, robusta y convincente. Para esto, es conveniente la actualización de los informes de las menores ya que los últimos son del 31 de marzo de 2011.[14] Surge de la petición de *certiorari* del Departamento

---

[14] Esto es cónsono con el Art. 41 de la Ley Núm. 246, 8 L.P.R.A. sec. 1151 (antes Art. 41 de la Ley Núm. 177, *supra*), el cual establece que durante el proceso, el Departamento debe rendir informes periódicos que contengan recomendaciones en

que profesionales de la conducta todavía están interviniendo con las menores, por lo que solo procede suplementar los mismos a base de las intervenciones realizadas hasta el momento. Asimismo, el Programa Biosicosocial también debe preparar un Informe con los hallazgos encontrados al presente. Además, dado que la única evaluación de la señora Cacho González es del 11 de septiembre de 2010, la misma debe ser actualizada para el beneficio del tribunal.

IV.

Por las razones expuestas anteriormente, estamos conformes con lo resuelto por este Tribunal. Sin embargo, añadimos que el estándar probatorio al que debe estar sujeto el Estado en este tipo de procedimiento es el de prueba clara, robusta y convincente.

Federico Hernández Denton
Juez Presidente

_____
cuanto a la extensión, modificación o cese del plan de servicios o de los esfuerzos razonables. Íd.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Departamento de la Familia<br><br>Peticionaria<br><br>v.<br><br>Ana Cacho González<br><br>Recurrido | CC-2012-1116<br>cons. con<br>CC-2012-1125 |

Opinión de Conformidad emitida por la Juez Asociada señora Rodríguez Rodríguez a la que se unen la Jueza Asociada señora Pabón Charneco y los Jueces Asociados señor Kolthoff Caraballo y señor Rivera García.

San Juan, Puerto Rico, a 18 de junio de 2013

Estoy conforme con la Sentencia que emite el Tribunal. En ésta atendemos de manera adecuada el complejo procedimiento en el caso ante nosotros. Los hechos que generan la controversia que atendemos en el día de hoy surgen de la lamentable muerte del menor L.G.C. el 9 de marzo de 2010, en el hogar de su madre y aquí recurrida, la Sra. Ana Cacho González, hechos aun sin esclarecer. Luego de este trágico evento, se ha generado una controversia que requiere llevar a cabo un fino balance entre los derechos de los niños, los derechos de los padres y el deber *parens patriae* indelegable del Estado en casos de maltrato de menores. Sin embargo, dentro del contexto del caso ante nuestra consideración y reconociendo la responsabilidad del Estado en defensa del mejor interés del menor, difiero del criterio expresado por el Juez Presidente señor Hernández Denton en su Opinión de Conformidad de exigir el estándar

probatorio de prueba clara, robusta y convincente al Estado cuando se solicita el cese de esfuerzos razonables o el suspender las relaciones paterno/materno-filiales.

Ciertamente, estamos obligados a reconocer las protecciones constitucionales federales referentes a disposiciones constitucionales que le aplican a Puerto Rico y que han sido reconocidas por el Tribunal Supremo federal. Sin embargo, luego de un análisis cuidadoso del procedimiento ante la consideración del Tribunal Supremo Federal en *Santosky v. Kramer*, infra, entiendo que no nos encontramos ante un procedimiento que requiera exigir prueba clara, robusta y convincente en este momento. Existe una clara distinción entre el procedimiento llevado a cabo en *Santosky v. Kramer*,[15] *infra*, y el procedimiento ante nuestra consideración, ya que el procedimiento en *Santosky* **afectaba permanentemente el derecho a la patria potestad de los padres, derecho distinguible al de requerir esfuerzos razonables o solicitar relaciones paterno/materno-filiales.** La discusión en *Santosky* no estuvo dirigida a establecer una carta blanca de protección a cualquier derecho "que emana de la maternidad y la paternidad", Opinión de Conformidad del Juez Presidente

---

[15] No podemos olvidar la fuerte crítica y el intenso debate que ha generado esta opinión del Tribunal Supremo federal. *Véase* Rebecca Mandel, *The Evidence is "Clear and Convincing": Santosky v. Kramer Is Harmful to Children*, 26(4) Child. Legal Rts. J. 1 (2006); Raymond C. O'Brien, *An Analysis of Realistic Due Process Rights of Children Versus Parents*, 26 Conn. L. Rev. 1209 (1994); Mario J. Rizzo, *The Economics of Termination of Parental Rights: Santosky v. Kramer,* 2 Sup. Ct. Econ. Rev. 277 (1983); Robert A. Wainger, *Santosky v. Kramer: Clear and Convincing Evidence in Actions to Terminated Parental Rights*, 36 U. Miami L. Rev. 369 (1982).

señor Hernández Denton, en la pág. 14, sino al concepto de la patria potestad.

Con respecto a la admisibilidad del testimonio de la doctora Elsa Cardalda y el alcance del descubrimiento de prueba, compartimos la posición de la Opinión de Conformidad del Juez Presidente señor Hernández Denton. También soy del criterio de que procede la celebración de una nueva vista tanto para la determinación de si procede reanudar las relaciones materno-filiales como para determinar si cesan los esfuerzos razonables de reunificación. Ahora bien, como estas determinaciones **no afectan de manera permanente e irrevocable el derecho a la patria potestad** de la señora Cacho González, no estamos obligados a exigirle al Estado prueba clara, robusta y convincente en este momento. Exigir este estándar en esta etapa de los procedimientos expande innecesariamente lo resuelto por el Tribunal Supremo federal en *Santosky*. Finalmente, también creo conveniente la actualización de los informes de las menores, ya que los últimos informes disponibles son del 31 de marzo de 2011, y el Artículo 41 de la Ley Núm. 246, 8 L.P.R.A. sec. 1151, establece que el Departamento de Familia debe rendir informes periódicos.

## I

Los hechos y el tracto procesal que originan la actual controversia están adecuadamente detallados en la Opinión de Conformidad emitida por el Juez Presidente señor Hernández Denton, por lo que entendemos innecesario y

redundante repetirlos en este momento. Veamos el derecho aplicable a este caso.

## II

### A

En *Santosky v. Kramer*, 455 U.S. 745 (1982), el Tribunal Supremo federal sostuvo que "[b]efore a State may sever **completely and irrevocably** the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence". *Id.* en las pág. 747-748 (énfasis suplido). Al requerir este estándar de prueba en procedimientos iniciados por el Estado que buscan romper de manera permanente el derecho de los padres o madres con relación a sus hijos, el Tribunal reconoció que la libertad individual en asuntos de la familia constituye un interés libertario fundamental protegido por la Decimocuarta Enmienda. *Id.* en la pág. 753.[16]

La controversia en *Santosky* versaba sobre la constitucionalidad de un estatuto del estado de Nueva York que bifurcaba en dos vistas el procedimiento para terminar de forma permanente el derecho del padre o la madre con sus hijos. Esta determinación significa la pérdida del derecho a la custodia, el derecho a visitas, el derecho a comunicarse con el niño o la niña o el derecho a recuperar

---

[16] Expresó el Tribunal Supremo federal: "[F]reedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment". *Santosky v. Kramer*, 455 U.S. en la pág. 753.

en algún momento  la custodia del menor.[17]  En la primera vista el Estado debía probar, por preponderancia de la prueba, que el menor ha sido descuidado de forma negligente según definido por el derecho del estado de Nueva York. Esta vista se conoce como una de determinación de hechos. En la siguiente vista, el Tribunal debía determinar, según el mejor interés del menor, bajo quién debía ubicarse el menor.  A esta segunda vista se le conoce como una vista de disposición.

Enfrentados por el procedimiento de **terminación permanente de sus derechos** con sus hijos, el señor y la señora Santosky cuestionaron la validez constitucional del estándar de prueba requerido por el estatuto de Nueva York. Tras reconocer el interés libertario de los padres, el Tribunal Supremo federal procedió a delinear un balance entre los tres factores distintivos sobre el debido proceso de ley requerido en estos procedimientos, según establecidos en *Mathews v. Eldridge*: el interés privado afectado por el procedimiento; el riesgo a error creado por el Estado debido al procedimiento; y el interés gubernamental que apoya el uso del procedimiento en cuestión. *Véase Id.* en la pág. 754; *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

---

[17] Según resalta la opinión del Tribunal Supremo federal, aquellos padres en el Estado de Nueva York a quienes se les quitaban los derechos con relación a sus hijos tan sólo tenían disponible dos razones estrechas para dejar sin efecto una determinación del tribunal: fraude o el descubrimiento de nueva evidencia.  *Véase Id.* en la pág. 749 n. 1.

Luego de evaluar cada uno de estos factores, concluyó que un estándar de evidencia que requiera prueba clara, robusta y convincente, transmite al juzgador el nivel de certeza necesaria en sus conclusiones de hecho que satisface el debido proceso de ley. *Santosky*, 455 U.S. en la pág. 769. Además, determinó que le corresponde a los estados establecer de manera precisa un estándar de prueba de igual o mayor peso. Como se puede apreciar, la preocupación principal que atendía el Tribunal Supremo federal era la **irrevocabilidad y terminación permanente** del derecho a la patria potestad de los padres basada solamente en la preponderancia de la prueba. Ahora bien, existen marcadas diferencias entre los hechos y el procedimiento del caso ante nosotros y el caso que tuvo el Tribunal Supremo federal ante su consideración.

### III

En Puerto Rico, a través del derecho a la intimidad, se ha reconocido constantemente el derecho fundamental de los padres a relacionarse con sus hijos. *Véase Rexach v. Ramírez*, 162 D.P.R. 130 (2004). Los padres "de ordinario tienen derecho a decidir sobre el cuido, la custodia y el control de sus hijos". *Estrella, Monge v. Figueroa Guerra*, 170 D.P.R. 644, 663 (2007) *citando a Rivera v. Morales*, 167 D.P.R. 280, 290 (2006). Ahora bien, no hay derecho fundamental que sea absoluto, y por lo tanto, "los derechos de los padres pueden limitarse en aras de proteger **un interés apremiante del Estado**, como lo es [el] bienestar de los menores". *Rexach*, 162 D.P.R. en la pág. 147. (énfasis

suplido). Además, en numerosas ocasiones hemos expresado que "[a]un cuando el derecho de un progenitor a tener consigo a sus hijos es de superior jerarquía, éste tiene que ceder ante la facultad de *parens patriae* del Estado de salvaguardar y proteger el bienestar del menor". *Pena v. Pena*, 164 D.P.R. 949, 959 (2005). *Véase Ortíz v. Meléndez,* 164 D.P.R. 16 (2005); Rexach *v. Ramírez Velez*, 162 D.P.R. 130, 148 (2004).

Cabe indicar que los hechos de este caso comenzaron al amparo de la hoy derogada Ley Núm. 177 de 1 de agosto de 2003, conocida como la Ley para el Bienestar y la Protección de la Niñez (Ley Núm. 177). Sin embargo, en el trascurso de los procedimientos la Asamblea Legislativa primero enmendó el Artículo 50 de la Ley Núm. 177 por medio de la Ley Núm. 205 de 17 de diciembre de 2010 y posteriormente adoptó la Ley Núm. 246 de 16 de diciembre de 2011, conocida como la Ley para la Seguridad, Bienestar y Protección de Menores (Ley Núm. 246), derogando la Ley Núm. 177. Por lo tanto, discutiremos ambos estatutos.

El deber de *parens patriae* del Estado "con respecto a los niños es bien conocido y consiste de promover su bienestar, como seres humanos y como ciudadanos potenciales, y de velar por el establecimiento del ambiente más adecuado posible para el desarrollo de su personalidad". *Muñoz v. Torres*, 75 D.P.R. 507, 512-513 (1953). Acorde con este deber, la Asamblea Legislativa ha adoptado legislación que habilita la intervención oportuna del Estado en aquellos casos de maltrato infantil. Como

norte, la legislación busca prevenir la terrible situación de abuso a los menores que acarrea un sinnúmero de repercusiones en la calidad de vida de los niños y niñas que lo sufren. Sin embargo, reconoce también como política pública el deseo de lograr una reunificación familiar, siempre y cuando ésta sea **en el mejor bienestar del menor**. Exposición de Motivos, Ley Núm. 246 de 16 de diciembre de 2011 (énfasis suplido). Según ambas leyes en cuestión, el "mejor bienestar del menor" consiste de un "balance entre los diferentes factores que pueden afectar la seguridad, salud, bienestar físico, mental, emocional, educativo, social y cualquier otro dirigido a alcanzar el desarrollo óptimo del menor". 8 L.P.R.A. sec. 1101(x).[18]

Por otro lado, el estatuto define maltrato como:

[T]odo acto u omisión intencional en el que incurre el padre, la madre o persona responsable del menor de tal naturaleza que ocasione o ponga a éste en riesgo de sufrir daño o perjuicio a su salud e integridad física, **mental y/o emocional**, incluyendo abuso sexual, según es definido en esta Ley. También, se considerará maltrato el incurrir en conducta obscena y/o la utilización de un menor para ejecutar conducta obscena; permitir que otra persona ocasione o ponga en riesgo de sufrir daño o perjuicio a la salud e integridad física, mental y/o emocional del menor; abandono voluntario de un menor, que el padre, madre o persona responsable del menor explote a éste o permita que otro lo haga obligándolo o permitiéndole realizar cualquier acto, incluyendo pero sin limitarse a, utilizar al menor para ejecutar conducta obscena, con el fin de lucrarse o de recibir algún beneficio; incurrir en conducta que, de procesarse por la vía criminal, constituiría delito contra la salud e integridad física, mental, emocional, incluyendo abuso sexual del menor. Asimismo, se considerará que un menor es víctima de maltrato si el padre, la madre o persona responsable del menor ha incurrido en la conducta descrita o ha

---

[18] La definición de "mejor interés del menor" en la Ley Núm. 177 refleja una idéntica redacción.

> incurrido en conducta constitutiva de violencia
> doméstica en presencia de los menores, según
> definido en la Ley 54-1989, según enmendada.

*Id.* sec. 1101(v)(énfasis suplido).

Ahora bien, tanto la Ley Núm. 177 como la Ley Núm. 246 establecen el procedimiento judicial que se debe seguir cuando una investigación refleja que existe una situación de maltrato. Cuando los hechos de maltrato lo ameritan, el Departamento de Familia puede solicitar la protección del menor mediante una remoción en un procedimiento de emergencia. *Véase* Art. 37 de la Ley Núm. 246, 8 L.P.R.A. sec. 1147. En ese caso, el tribunal hará una determinación fundamentada en el mejor interés del menor, concediendo la custodia de emergencia al Departamento, decretando cualquier permiso para llevar a cabo el tratamiento médico necesario y cualquier otra orden necesaria para garantizar el mejor bienestar del menor. *Id.* Dentro de quince (15) días de otorgada la custodia de emergencia al Departamento, el Tribunal de Primera Instancia debe celebrar una vista de ratificación. Si la prueba presentada en la vista de ratificación muestra que prevalecen las circunstancias que motivaron la remoción de emergencia, el tribunal "podrá conceder la custodia legal provisional al Departamento". 8 L.P.R.A. sec. 1149.[19]

Una vez el menor ha sido removido, la Ley Núm. 177 requería que el Departamento de Familia llevara a cabo

---

[19] Es relevante resaltar que el Artículo 39 de la Ley Núm. 246 ahora permite presentar la solicitud de exoneración de llevar a cabo los esfuerzos de reunificación en la Vista de Ratificación de Custodia y el tribunal podrá llevar a cabo ambas vistas a la vez. *Véase*, 8 L.P.R.A. sec. 1149.

*esfuerzos razonables* "para reunificar al menor con su familia por un período que no excederá de los doce (12) meses", salvo en unas limitadas excepciones.[20] Art. 50 Ley

---

[20] La Ley Núm. 177 disponía que:

> 3. No se harán esfuerzos razonables para reunir a un menor con su padre, madre o persona responsable de éste en las siguientes circunstancias:
>
> > (a) Los esfuerzos para cambiar el comportamiento del padre, de la madre o persona responsable del menor no han sido exitosos luego de doce (12) meses de haberse iniciado el plan de servicios según la evidencia presentada en el caso.
> >
> > (b) Cuando un padre, una madre o persona responsable del menor ha manifestado no tener interés en la reunificación con el menor.
> >
> > (c) Cuando se certifique por un profesional de la salud que el padre, la madre o persona responsable del menor sufre de una incapacidad o deficiencia mental de tal magnitud que le impide beneficiarse de los servicios de reunificación y no será capaz de atender adecuadamente el cuido del menor.
> >
> > (d) El menor ha sido removido del hogar con anterioridad y luego de haberse adjudicado la custodia del menor al padre, a la madre o persona responsable de éste, el menor, un hermano/a o cualquier otro miembro del núcleo familiar es nuevamente removido por haber sido víctima de maltrato y/o negligencia.
> >
> > (e) El padre y la madre han sido privados de la patria potestad respecto a otros de sus hijos y no han podido resolver los problemas que causaron la pérdida de la patria potestad.
> >
> > (f) El padre, la madre o persona responsable del menor incurre en la conducta o las conductas que se especifican en el inciso (e) y (f) de la sección 2 del presente Artículo.
> >
> > (g) EL padre, la madre o persona responsable del menor incurre en conducta que de procesarse por la vía criminal constituiría delito al ayudar, intentar, conspirar, solicitar o aconsejar a la comisión de delitos que atentan contra la salud e integridad física, mental, emocional del menor, según se dispone en la Ley Núm. 115.
> >
> > (h) el padre, la madre o persona responsable del menor incurre en conducta obscena según definida por la Ley Núm. 115.
> >
> > (i) Cuando se certifique por un profesional de la salud que el padre y/o la madre o persona

Núm. 177. Posteriormente, en las vistas de seguimiento, el Departamento tenía la obligación de rendir informes con una evaluación periódica y recomendaciones con respecto a la continuación, modificación o el cese de los *esfuerzos razonables*. Art. 41, Ley Núm. 177, 8 L.P.R.A. sec. 447j (derogado por la Ley Núm. 246). Sólo cuando se determinara que luego de llevar a cabo los *esfuerzos razonables* de reunificación no se recomendaba el regreso del menor al hogar de su padre, madre o persona responsable, se podía iniciar un procedimiento para la privación de patria potestad. Art. 42, Ley Núm. 177, 8 L.P.R.A. sec. 447k (derogado por la Ley Núm. 246).

La Ley Núm. 246 mantuvo esencialmente el mismo esquema que la Ley Núm. 177 para aquellos casos donde es necesaria la privación, restricción o suspensión de la patria potestad a un padre o una madre. El Artículo 51 de la Ley Núm. 246 establece que el Departamento **podrá** solicitar dentro de cualquier procedimiento instado para proteger al menor víctima de maltrato, la privación de la patria potestad del padre o la madre. 8 L.P.R.A. sec. 1161. De presentarse una petición a esos efectos, **"será obligatoria la celebración de una vista"** dentro de quince (15) días de notificarse la solicitud de privación, restricción o suspensión de patria potestad. En esta vista el

_____
responsable del menor padece de un problema crónico de abuso de sustancias controladas que impide que se pueda regresar la custodia del menor a uno de éstos dentro de un período de doce (12) meses de haberse iniciado los procedimientos.
Art. 50 (3). Ley Núm. 177, 8 L.P.R.A. sec. 447s(3) (derogada por la Ley Núm. 246).

Departamento **tendrá que probar la existencia de maltrato y/o negligencia según definido en la Ley Núm. 246 o cualquiera de las circunstancias descrita en el Artículo 166B del Código Civil de Puerto Rico.**[21] *Id.*

El Artículo 52 de la Ley Núm. 246 enumera aquellas circunstancias en la que el Departamento **podrá iniciar** un procedimiento de privación, restricción o suspensión de la patria potestad. 8 L.P.R.A. sec. 1162. Relevante para el caso ante nosotros, en su inciso (b) dispone que se podrá iniciar el procedimiento de privación de patria potestad tras una determinación de que no procede realizar esfuerzos razonables o se ordena el cese de los mismos. Ahora bien, en la petición, según el Artículo 53, el Departamento tendrá que incluir una exposición de los **hechos** que constituyen base suficiente para la petición de privación de patria potestad. 8 L.P.R.A. sec. 1163. Como la solicitud de privación, suspensión o restricción de patria potestad es una dentro de un procedimiento bajo la Ley Núm.

---

[21] El Artículo 166b dispone para la privación de patria potestad por causa de defecto o condición mental o emocional. 31 L.P.R.A. 634b. Esta referencia al Artículo 166b nos parece un error legislativo ya que este artículo sólo se refiere a la privación de patria potestad de un padre o madre cuando éste muestra alguna enfermedad, defecto o condición mental, emocional, alcoholismo o adicción a sustancias controladas. Por otro lado, el Artículo 166a de nuestro Código Civil dispone de todas las causales por las cuales se puede privar, restringir o suspender la patria potestad. 31 L.P.R.A. 634a. Para probar cualquiera de estas causales será necesario que el Estado cumpla con el estándar de prueba clara, robusta y convincente. Sin embargo, debido a la calara letra de la ley, una solicitud de privación de la patria potestad bajo cualquiera de éstas causales no puede ser iniciado dentro de un procedimiento instado para proteger al menor víctima de maltrato bajo la Ley Núm. 246, sino mediante un procedimiento independiente.

246, el Estado sólo puede alegar hechos que constituyan maltrato y/o negligencia o que el padre o la madre de quien se busca afectar su patria potestad padece de una enfermedad, defecto o condición mental o emocional, o que padece de una condición de alcoholismo o adicción a sustancias controladas. *Véase* Cód. Civ. P.R. Art. 166b. 31 L.P.R.A. sec. 643b.

En el año 2011, la Ley Núm. 246 presenta un cambio de política pública con respecto a la obligación del Departamento a llevar a cabo los *esfuerzos razonables* de reunificación. La nueva Ley para la Seguridad, Bienestar y Protección de Menores condiciona los esfuerzos razonables a aquellas situaciones donde sea viable "y se pueda garantizar la seguridad, bienestar y el mejor interés de los menores". 8 L.P.R.A. sec. 1159. Además, la nueva ley reduce el período de tiempo durante el cual el Departamento deberá llevar a cabo los esfuerzos razonables a no más de seis (6) meses. Este cambio, según refleja la Exposición de Motivos de la Ley Núm. 264, tiene el propósito "de asegurar que los procedimientos en los casos de maltrato de menores se atiendan con diligencia, dejando a un lado la interpretación liberal a favor de la reunificación familiar y enfocándose en lograr la seguridad y protección, asimismo el bienestar físico, emocional y psicológico del menor, por encima de cualquier otro interés". Exposición de Motivos, Ley Núm. 246. Sin embargo, no se enmendó la política pública de que al "asegurar el mejor interés y la protección integral de los menores...[se] deben proveer[]

oportunidades y esfuerzos razonables que permitan preservar los vínculos familiares". Artículo 2, Ley Núm. 246.

De cualquier modo, ambos estatutos disponen para que el Departamento lleve a cabo *esfuerzos razonables* dirigidos a la reunificación familiar **que no se pueden cesar** hasta que un tribunal determine alguna de las circunstancias establecidas por ley.

**B**

Por otro lado, la relación paterno/materno-filial "[s]e refiere a aquel derecho que corresponde naturalmente al padre o a la madre para comunicarse y relacionarse" con sus hijos. *Sterzinger v. Ramírez*, 116 D.P.R. 762, 775 (1985). Como bien resalta el Juez Presidente señor Hernández Denton, este es un derecho de naturaleza personal y familiar de contenido afectivo. Opinión de Conformidad del Juez Presidente señor Hernández Denton, en la pág. 11.

Este Tribunal ha reconocido que el derecho de los padres y madres a poder "mantener relaciones con sus hijos es tan importante que los tribunales pueden regular las relaciones paterno-filiales, **pero no pueden prohibirlas totalmente**, a menos que existan casusas muy graves para hacerlo". *Sterzinger*, 116 D.P.R. en la pág. 775 (énfasis suplido). Ahora bien, al momento de decidir un caso sobre las relaciones paterno/materno-filiales, el Tribunal debe considerar "todos los factores que tenga a su alcance para lograr la solución más justa". *Id.* en la pág. 778. Y finalmente, al llevar a cabo un delicado balance de todos los intereses involucrados, debe **"inclinar la balanza del**

**lado del bienestar del menor**". *Id.* en la pág. 779 (énfasis suplido).

**IV**

Comparemos ahora el procedimiento ante nosotros y aquel que evaluó el Tribunal Supremo federal en *Santosky*. Es necesaria esta comparación ya que, según la Opinión de Conformidad del Juez Presidente señor Hernández Denton, nos encontramos ante un procedimiento donde aplica la doctrina del ámbito mínimo federal y el debido proceso de ley requiere prueba clara, robusta y convincente en cualquier determinación con respecto a las relaciones paterno/materno-filiales o de cese de esfuerzos razonables bajo la Ley para la Seguridad, Bienestar y Protección de Menores.[22] No obstante, en la medida de que el derecho puertorriqueño se beneficia tanto del derecho angloamericano como de conceptos y figuras del derecho civilista, es necesario definir la aplicabilidad de *Santosky* al Derecho de Familia puertorriqueño.

En primer lugar, la doctrina del ámbito mínimo federal nos obliga a reconocer aquellas protecciones referentes a disposiciones constitucionales federales aplicables a Puerto Rico. En este caso, según la Opinión de Conformidad del Juez Presidente señor Hernández Denton, esto requiere reconocer, como mínimo, un estándar de prueba clara, robusta y convincente a los padres en todo procedimiento que afecte algún derecho sobre sus hijos. Sin embargo, al estudiar cuidadosamente el caso de *Santosky v. Kramer*, 455

---

[22] *Véase* Opinión de Conformidad del Juez Presidente señor Hernández Denton.

U.S. 745 (1982), y el derecho de los padres que se protegía bajo la decimocuarta enmienda federal, notamos que la conclusión a la que llega el Juez Presidente no es necesariamente correcta. *Santosky* versaba sobre un procedimiento que conllevaba un "*termination of parental rights*". Según el Black's Law Dictionary la frase *termination of parental rights* significa: "[a] legal severing of a parent's rights, privileges, and responsibilities regarding his or her child. Termination of a parent's rights **frees the child to be adopted by someone else**". Black's Law Dictionary, pág. 712 (2001)(énfasis suplido). De la misma manera, el término *parental rights* significa: "A parent's right to make all decisions concerning his or her child, including the right to determine the child's care and custody, the right to educate and discipline the child, and the right to control the child's earnings and property". *Id.* en la pág. 521. En otras palabras, el derecho que se encontraba ante la consideración del Tribunal Supremo federal y al cual se le reconoce que se encuentra protegido por la decimocuarta enmienda con el requisito de exigir un estándar de prueba clara, robusta y convincente, es el derecho de los padres y madres a tomar las decisiones concernientes a sus hijos con respecto a su cuidado, custodia, educación, disciplina y patrimonio, cuando se busca terminar de forma permanente ese derecho.

Para aplicar la protección que reconoce el Tribunal Supremo federal, debemos estudiar el Derecho de Familia

puertorriqueño y determinar a qué concepto civilista le es aplicable esta protección. En nuestro ordenamiento existen tres conceptos principales que recogen los derechos y deberes de los padres y madres con sus hijos. Éstos son: la patria potestad, la custodia y las relaciones paterno/materno filiales. *Véase Domínguez Mejías v. E.L.A.*, 122 D.P.R. 832 (1988); *Ex parte Torres*, 118 D.P.R. 469 (1987); *Sterzinger v. Ramírez*, 116 D.P.R. 762 (1985).

Hemos definido la **patria potestad** como "el conjunto de derechos y deberes que corresponde a los padres sobre la persona y el patrimonio de cada uno de sus hijos no emancipados, como medio de realizar la función natural que les incumbe de proteger y educar a la prole". *Id.* en la pág. 836 (citando a J.M. Castán Vázquez, *La Paria Potestad*, Madrid, Ed. Rev. Der.).

Por otro lado, la **custodia** "es un componente de la patria potestad" que le impone al padre o la madre el deber de mantener a sus hijos no emancipados en su compañía. *Ex parte Torres*, 118 D.P.R. 469 (1987). Esto quiere decir que todo padre o madre que ostente la patria potestad sobre su hijo o hija, necesariamente ostenta la custodia sobre él o ella. Finalmente, reconocimos en *Sterzinger v. Ramírez*, *supra*, que en el caso de que un padre o una madre no ostente la custodia de su hijo o hija, éste posee un derecho a "continuar las relaciones de familia" con tal hijo o hija. *Sterzinger*, 116 D.P.R., en la pág. 775.

En resumen, en el Derecho de Familia puertorriqueño, de corte civilista, el derecho de los padres consiste de

tres conceptos distintos. En primer lugar, y sin duda el de mayor alcance, la **patria potestad.** Como parte de la patria potestad sobre sus hijos, los padres también poseen la **custodia** de éstos, y ante la situación donde no poseen esta última, se les reconoce un derecho a mantener **relaciones filiales.**

Con estas definiciones ante nosotros no podemos más que concluir que el concepto que estaba ante la consideración del Tribunal Supremo federal en *Santosky* no era otra cosa más que un procedimiento de privación de la **patria potestad.** Esto se entiende de la propia Opinión federal por dos razones. En primer lugar, el estatuto del estado de Nueva York en controversia disponía del procedimiento para que el Estado lograra liberar al menor para una adopción.[23] Y segundo, el Tribunal Supremo federal explica que, en efecto, el procedimiento que estaba ante su consideración "denies the natural parents physical custody, as well as the rights **ever** to visit, communicate with, or regain custody of the child". *Santosky*, 455 U.S. en la pág. 749 (énfasis suplido).

Así mismo lo resume el profesor Efraín González Tejera al explicar los efectos de la privación de la patria potestad bajo el Derecho Civil. Nos dice el profesor González Tejera que:

---

[23] Nos explica la Opinión mayoritaria en *Santosky* que: "[I]f convinced that 'positive, nurturing parent-child relationships no longer exist', the State may initiate 'permanent neglect' proceedings to free the child for adoption". *Santosky v. Kramer*, 455 U.S. en la pág. 748 (citas omitidas).

> Contrario a la privación de custodia, la pérdida de la patria potestad significa la ruptura **total de relaciones entre el padre y el hijo**. El padre que pierde la patria potestad pierde el derecho a visitar a su hijo y a comunicarse con él. Pierde, asimismo, el derecho a ser oído en la toma de decisiones críticas en torno al hijo, como lo sería todo lo relativo a su educación, religión y salud.

Efraín González Tejera, *Bienestar del menor: Señalamientos en torno a la patria potestad, custodia y adopción*, 54 Rev. Jur. U.P.R. 409, 411 (1985)(énfasis suplido).

El propio Tribunal Supremo federal ha reconocido las particularidades de los procedimientos de terminación de patria potestad, enfatizando el hecho de que un decreto en tal procedimiento es final e irrevocable. *Véase M.L.B. v. S.L.J*, 519 U.S. 102, 118 (1996)(citando a *Santosky v. Kramer*, 455 U.S. en la pág. 759). Finalmente, el Tribunal Supremo federal reconció que "[i]n contrast to matter **modifiable** at the parties' will **or based on changed circumstances**, termination adjudications involve the awesome authority of the State 'to destroy permanently all legal recognition of the parental relationship'. Our *Lassiter* and *Santosky* decisions, recognizing that parental termination decrees are among the most severe form of state action, **have not served as precedent in other areas**". *M.L.B.* 519 U.S. en las págs. 127-128 (énfasis suplido).

Por otro lado, al cuestionarse el estándar de prueba requerido en un procedimiento de patria potestad, ya el profesor González Tejera había reconocido correctamente la aplicabilidad de *Santosky* en Puerto Rico. Explica el profesor:

> En Puerto Rico, en casos de **privación de patria potestad**, no ha habido expresión jurisprudencial o doctrinal en torno al standard de persuasión. No

> obstante, la norma sentada en *Santosky v. Kramer*, al efecto de que el debido proceso de ley exige en estos casos el standard de "prueba clara y convincente", nos parece conveniente y necesaria. Los intereses envueltos en casos de **privación o suspensión de patria potestad** son más importantes que en la determinación de responsabilidad civil ordinaria. En caso de **privación de patria potestad** es menester no solamente proteger al padre contra una decisión errónea, sino también al hijo porque ambos tienen intereses análogos en evitar un fallo equivocado.

González Tejera, *supra*, pág. 428 (énfasis suplido).

Como se puede observar, la crítica ha limitado el estándar de *Santosky* a casos relativos a patria potestad, más no a controversias como la presente.

## V

En el caso ante nuestra consideración nos encontramos en un procedimiento iniciado bajo la Ley Núm. 177, estatuto que le provee las herramientas al Estado para implementar su deber *parens patriae* en la protección de la salud física, emocional y psicológica de los menores. Particularmente, el estado de los procedimientos en la cual nos encontramos es lo que bajo la Ley Núm. 177 y la Ley Núm. 246 se conoce como una vista de seguimiento. *Véase* Art. 41 Ley Núm. 177, 8 L.P.R.A. sec. 447j (derogado por la Ley Núm. 246); 8 L.P.R.A. sec. 1151. En ningún momento el Departamento de la Familia ha presentado una solicitud de privación, restricción o suspensión de la patria potestad de la señora Cacho González con respecto a sus dos hijas.

El tracto procesal de este caso está correctamente resumido en la Opinión de Conformidad del Juez Presidente señor Hernandez Denton y podemos apreciar ante qué procedimiento nos encontramos. Por una parte, en numerosas

ocasiones la señora Cacho González ha solicitado que se le permita sostener relaciones materno-filiales con sus hijas. Mientras tanto, una vez completado el Plan de Servicios por la señora Cacho González, la trabajadora social asignada al caso, la Sra. Iralis De Jesús Juarbe, "recomendó que se relevara al Departamento de continuar con los esfuerzos de reunificación". Opinión de Conformidad del Juez Presidente señor Hernández Denton, en la pág. 6. Ante esto, el Departamento presentó una moción para solicitar el relevo de llevar a cabo los esfuerzos razonables de reunificación. Por lo tanto, el Tribunal de Primera Instancia nunca tuvo ante su consideración procedimiento alguno que buscara la privación de la patria potestad de la señora Cacho González. Tanto la Ley Núm. 177 como la Ley Núm. 246 describen las situaciones en las que el Departamento podría solicitar la privación de la patria potestad, incluyendo aquella situación donde un tribunal determine que ya no se procede realizar esfuerzos razonables. *Véase* 8 L.P.R.A. sec. 1162; Art. 53 Ley Núm. 177, 8 L.P.R.A. sec. 447v (derogado por la Ley Núm. 246). Pero equiparar el procedimiento donde se determina la procedencia de conceder relaciones paterno/materno-filiales y la conveniencia de continuar ofreciendo esfuerzos razonables de reunificación con un procedimiento de privación de la patria potestad es un error insoslayable.

En primer lugar, cualquier determinación con respecto a las relaciones materno-filiales de la señora Cacho González con respecto a sus dos hijas no es final e

irrevocable. La determinación de un tribunal con respecto a las relaciones materno-filiales, al ser una determinación relacionada a la custodia del menor, "no constituye[] cosa juzgada ya que **puede[] ser modificado[] de ocurrir un cambio en los hechos y las circunstancias que así lo justifique**". *Figueroa Hernández v. Del Rosario Servoni*, 147 D.P.R. 121, 129 (1998)(énfasis suplido). Por lo tanto, no estamos ante una determinación que destruya permanentemente el reconocimiento legal al vínculo legal de la señora Cacho González y sus hijas. Véase *M.L.B. v. S.L.J*, 519 U.S. 102. Como bien reconoce el Tribunal Supremo federal, *Santosky* no debe ser el precedente a seguir en estas determinaciones. *Id.* en la pág. 128.

Lo mismo ocurre con la solicitud del Departamento de cesar los esfuerzos razonables de reunificación. Al no verse afectada la patria potestad directamente al evaluar la petición, no hay un requisito constitucional de exigir prueba clara, robusta y convincente en este procedimiento. La determinación de un tribunal de cesar los esfuerzos razonables de reunificación **sólo permite al Departamento ejercer su facultad discrecional de presentar una petición de privación de patria potestad.** En su solicitud el Departamento viene obligado a exponer aquellos hechos que constituyen base suficiente para la privación de la patria potestad, así sean maltrato o negligencia según definidos en la Ley Núm. 246 o cualquier situación reconocida en el Artículo 166b por el Código Civil que justifica la privación. Una vez presentada la solicitud, la Ley Núm.

246 exige la celebración de una vista donde se deberá probar, según el requisito constitucional establecido en *Santosky*, con prueba clara, robusta y convincente aquellos hechos alegados en la petición que constituyan alguna causal para la privación, restricción o suspensión de la patria potestad. Sólo en aquel procedimiento posterior donde el Departamento solicita la **privación de la patria potestad**, es que el Estado está obligado por la decimocuarta enmienda, a probar cualquiera de las circunstancias reconocidas tanto en el Código Civil, Cód. Civ. P.R. Art. 166b, 31 L.P.R.A. sec. 634b, como en la Ley Núm. 246, para privar, restringir o suspender la patria potestad, 8 L.P.R.A. sec. 1162. A diferencia del estatuto en controversia en el caso de *Santosky*, la Ley Núm. 246 no divide el procedimiento en dos vistas, la primera de determinación de hechos y la segunda vista de disposición. Más bien, una vista del Tribunal de Primera Instancia para evaluar una petición de privación, restricción o suspensión de la patria potestad fundamentaba en los Artículos 51, 52 y 53 de la Ley Núm. 246 consiste de la determinación de hechos y la determinación sobre disposición del mejor bienestar del menor. En este procedimiento posterior, alegar que un tribunal decretó el cese de esfuerzos razonables no será un hecho suficiente ni concluyente para decretar la privación, suspensión o restricción de la patria potestad por sí sólo. Si el Departamento no alega y prueba hechos de maltrato, negligencia o alguna de las circunstancias descritas en el Código Civil, el tribunal se

verá obligado a declarar sin lugar la petición de privación, suspensión o restricción de la patria potestad.

Por otro lado, no olvidemos que el procedimiento en *Santosky* tenía la grave e irremediable consecuencia que su determinación afectaba de forma **completa e irrevocable** el derecho de la patria potestad de los padres sobre sus hijos. *Véase Santosky v. Kramer,* 455 U.S. 745, 747 (1982). En el procedimiento ante nosotros, si un tribunal determinase que procede el cese de esfuerzos razonables de reunificación por parte del Departamento, un cambio en las circunstancias de la señora Cacho González podría llevar al mismo tribunal a decretar eventualmente la continuación de los esfuerzos razonables. Por lo tanto, ninguna determinación de los procedimientos que se encuentran **en estos momentos** ante este Tribunal afecta de forma completa e irrevocable el derecho a la patria potestad de la señora Cacho.

## VI

Por lo tanto, estoy conforme con lo resuelto por la Sentencia que emite este Tribunal en el día de hoy, pero difiero del criterio del Juez Presidente con respecto a requerir **de ahora en adelante** prueba clara, robusta y convincente en todo procedimiento que afecte algún derecho del padre o la madre. Reiteramos, que el requisito de prueba clara, robusta y convincente que reconoció el Tribunal Supremo federal en *Santosky v. Kramer* como parte del debido proceso de ley que exige la decimocuarta enmienda es de aplicación en nuestra jurisdicción pero sólo

a aquellos procedimientos que buscan la privación, restricción o suspensión de la **patria potestad.** Exigir este estándar en todo procedimiento que afecte algún derecho del padre o la madre contraviene la política pública promovida por este Tribunal y plasmada en la legislación dirigida a la protección de los menores. Soy del criterio que, en cualquier otro procedimiento el Estado sólo debe probar que la determinación promueve el mejor bienestar del menor, bajo el estándar ordinario de preponderancia. De lo contrario, el deber *parens patriae* del Estado quedará sumamente diluido, limitando excesivamente el poder de intervención en casos de maltrato sin poder proteger el mejor bienestar del menor. El exigir un estándar inferior al de prueba clara, robusta y convincente en los procedimientos anteriores a una solicitud de privación de la patria potestad no contraviene el enfoque primario de reunificación familiar tanto de la derogada Ley Núm. 177 como de la Ley Núm. 246. Más bien, le permite al Estado actuar oportunamente para proteger a aquellos menores que sufren de maltrato.

Por lo tanto, difiero de la aplicación expansiva de exigir el estándar de prueba clara, robusta y convincente en procedimientos a los cuales *Santosky* no es de aplicación. Procede devolver los procedimientos al Tribunal de Primera Instancia y que aplique el estándar de preponderancia de la prueba para llegar a una determinación tanto en la vista para determinar si procede conceder de

relaciones materno-filiales como en la vista de cese de esfuerzos razonables.


                                        Anabelle Rodríguez Rodríguez
                                              Juez Asociada